Christopher J. Christie
United States Attorney for the
District of New Jersey
By: Daniel Gibbons
Assistant United States Attorney

Mark L. Josephs
Suzette A. Smikle
Office of Consumer Litigation
U.S. Department of Justice

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. |
| CIVIC DEVELOPMENT GROUP, LLC, SCOTT PASCH, and DAVID KEEZER, | ) | |
| Defendants. | ) | |

**COMPLAINT FOR CIVIL PENALTIES, CONSUMER REDRESS, INJUNCTIVE AND OTHER RELIEF**

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("Commission"), for its Complaint alleges that:

1. Plaintiff brings this action under Sections 5(a)(1), 5(l), 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)(1), 45(l), 45(m)(1)(A), 53(b), 56(a), and 57b, to obtain monetary civil penalties, consumer redress,

injunctive, and other relief for defendants' violations of the June 5, 1998, final cease and desist order issued by the Commission ("Commission Order" or "Order"), and the Trade Regulation Rule Concerning Telemarketing Sales ("Telemarketing Sales Rule" or "Rule"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355 and under 15 U.S.C. §§ 45(l), 45(m)(1)(A), 53(b), 56(a), and 57b. This action arises under 15 U.S.C. § 45(a)(1).

3. Venue in the District of New Jersey is proper under 15 U.S.C. § 53(b) and under 28 U.S.C. §§ 1391(b-c) and 1395(a).

## DEFENDANTS

### Defendant Civic Development Group, LLC

4. Defendant Civic Development Group, LLC ("CDG"), is a New Jersey limited liability company with its office and principal place of business located within the District of New Jersey at 425 Raritan Parkway, Edison, New Jersey 08834.

5. CDG is the successor to Civic Development Group, Inc., and Community Network, Inc., the two corporations named in the Commission Order.

6. The Commission Order is expressly applicable to the named corporations' successors.

### Defendant David Keezer

7. Defendant David Keezer ("Keezer") is an officer and director of CDG.

8. At all times relevant to this Complaint, acting individually or in concert with others, Keezer has formulated, directed, controlled, had the authority to control, or participated

in the acts and practices of CDG, including the acts or practices set forth in this Complaint.

9. Keezer is named in the Commission Order individually and as an officer of Civic Development Group, Inc., and Community Network, Inc.

10. Keezer has the same principal office or place of business as CDG.

**Defendant Scott Pasch**

11. Defendant Scott Pasch ("Pasch") is an officer and director of CDG.

12. At all times relevant to this Complaint, acting individually or in concert with others, Pasch has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of CDG, including the acts or practices set forth in this Complaint.

13. Pasch is named in the Commission Order individually and as an officer of Civic Development Group, Inc., and Community Network, Inc.

14. Pasch has the same principal office or place of business as CDG.

15. At all times relevant to this Complaint, defendants transact or have transacted business in this district.

**COMMERCE**

16. The acts and practices of Keezer, Pasch, and CDG ("defendants") alleged in this Complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**PRIOR COMMISSION PROCEEDING**

17. In a Commission proceeding bearing Docket No. C-3810, the Commission's Complaint charged that defendant CDG's corporate predecessors and defendants Keezer and Pasch (collectively referred to in the Commission Order as "respondents") violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by misrepresenting that donations to the American Deputy

Sheriff's Association, a non-profit organization, had gone and would go to law enforcement officers in the donor's locality, that donations had been and would be used to buy bullet-proof vests for local law enforcement officers, and that donations had been and would be used to pay death benefits to survivors of local law enforcement officers. On June 5, 1998, the Commission issued its Decision and Order against respondents to cease and desist certain practices, including those set forth below. The Commission Order was served on respondents on July 2, 1998, and by operation of law became final and enforceable thereafter. (A copy of the Commission's 1998 Complaint and Decision and Order are attached to this Complaint as Appendix A).

18. The Commission's Order includes the following provisions:

<u>ORDER</u>

* * *

I.

> *It is ordered,* That respondents, directly or through any corporation, subsidiary, division, or other device, in connection with telephone solicitation, shall not misrepresent, in any manner, expressly or by implication, the purpose for which charitable contributions have been or will be used.

* * *

III.

> *It is further ordered,* That respondents, directly or through any corporation, subsidiary, division, or other device, in connection with telephone solicitation, shall not misrepresent, in any manner, expressly or by implication, any fact material to the decision of any person to make any charitable contribution.

* * *

VIII.

> *It is further ordered,* That respondents, directly or through any corporation, subsidiary, division, or other device, shall not provide means

and instrumentalities to, or otherwise assist or facilitate, any person who respondents know or should know makes false or misleading representations about the purpose for which charitable contributions have been or will be used, the geographic location of the charity, organization or program that has benefitted or will benefit from charitable contributions, or any other fact material to the decision of any person to make any charitable contribution.

For purposes of this paragraph, “assist or facilitate” includes but is not limited to:

Providing or arranging for the provision of telephone service or equipment;

Providing or arranging for the provision of computer hardware or software;

Providing or assisting in the development of telephone scripts or other marketing material;

Mailing or arranging for the mailing of any solicitation or marketing material; or

Providing or arranging for the provision of names of prospective contributors.

**DEFENDANTS’ COURSE OF CONDUCT**

19. At all times relevant to this Complaint, defendants have engaged in the advertising, promotion, offering for sale, sale, or distribution of telemarketing and professional fund-raising goods and services to not-for-profit police, firefighter, and other organizations (hereinafter, “charity” or “charities”) in various states and Canada.

20. Starting in or about 2004, defendants began changing their contracts with the charities to identify CDG as the charities’ “professional management consultant” (“PMC”) instead of the charities’ professional fund-raiser.

21. Defendants created the PMC arrangement to evade the Order and the Rule. Defendants attempted to create the impression that the charities staff and run the fund-raising

campaigns without the involvement of any professional fund-raiser or middleman in order to suggest that the charities receive a relatively large share of contributions. In reality, however, CDG, not the charities, directs the solicitors, runs the campaigns, and the charities receive a small percentage of the donations for their own use.

22. The PMC contract, as well as scripts used by telephone solicitors, indicate:

A. that the telephone solicitors contacting prospective donors on behalf of the charities work for the charities;

B. that the charities run their own fund-raising campaign; and

C. that donations are paid directly to the charity.

23. Specifically, pursuant to the PMC arrangement, defendants provide scripts used by the telephone solicitors that state in substance or verbatim:

A. "[Prospect's name], this is [solicitor's name]. I work directly for [charity].... I'm going to be sending a decal out to [person's address]. Please display this proudly to show your support of [charity]. Now [charity] does need your support, and donation levels are gold at $45 and silver at $25. Which one is best for you?"

B. If the person asks, "What company do you work for?" or "What fund-raising company are you calling from?" the script prompts, "Sir/Ma'am, I work directly for [charity]. I am an [charity] employee calling you from the fund-raising center in [place]. I do not work for a fund-raising company."

C. If the person persists, the script prompts, "Sir/Ma'am, I do not think you understand, the [charity] IS the fund-raiser. I am NOT an employee of a

third party telemarketing company. The [charity] operates its own call center and I am employed directly by them, so they don't need to hire a professional fund-raising company." (Emphasis in original.)

D. If persons ask, "How much of my donation goes to [charity]?" the script says, "100% goes directly to [charity]. I am an employee of [charity] and not an outside fund-raising company. The [charity] now runs an in-house fund-raising drive from the [charity's] office. Of course, there are costs associated with the drive and the [charity] programs, but they are all paid directly by [charity]."

E. If persons ask, "How much does the organization receive?" the script prompts, "100% of the funds collected will go to [charity], a portion of which will be used to pay the cost of the fund drive."

F. If persons ask, "Why Doesn't your number display on my caller ID?" the script prompts, "The Telephone Sales Rule exempts nonprofits and political calls from the new caller-id requirements."

24. Pursuant to the PMC arrangement, however, defendants continue to recruit, hire, train, manage, and discipline the telephone solicitors.

25. In addition defendants:

A. prepare payroll and payroll reports;

B. provide and maintain insurance for the charity against the acts or omissions of the call center personnel;

D. arrange for the charity to designate a charity employee as "Director of Fund-raising;" and

E. sub-let the call center to the charity.

26. Under the PMC arrangement, defendants also run the fund-raising campaign for the charities.

27. Specifically defendants:

A. prepare scripts used to solicit donations, brochures, and fund-raising correspondence;

B. print and mail response pieces and “supporter” decals;

C. analyze and provide reports on the progress of the campaign and on the performance of individual solicitors;

D. deposit federal and state withholding and FICA for telephone solicitors and prepare W-2's and tax returns;

E. acquire and maintain phone service for the telephone solicitations;

F. provide computer, recording and other equipment, and provide technical support to maintain such equipment;

G. obtain and maintain furniture, supplies, and facilities for use at the telephone call centers;

H. collect, manage, and account for charitable donations;

J. provide and maintain Broad Form Commercial Liability Insurance for the fund-raising activities;

K. monitor the charity’s compliance with state and local laws relating to fund-raising and assure the appropriate government forms and applications are filed timely;

L. supply and manage lead lists; and

M. provide capitalization to seed fund-raising campaigns until they begin generating a sustaining cash flow.

28. The PMC contract provides that donations be sent directly to the charities, using language such as the following:

> All proceeds...shall be deposited in a bank account under the sole and exclusive control of [charity] (hereinafter referred to as the 'Depository Account'). The proceeds shall be directed to a financial institution for processing. [Charity] has selected Financial Processing Services to provide this function.

29. The PMC charities select Financial Processing Services ("FPS") to process donations.

30. FPS is headed by Dolores Keezer.

31. Dolores Keezer is defendant Keezer's mother.

32. Telephone solicitors direct donors to send their contributions to commercial mailboxes opened in the names of the charities.

33. Dolores Keezer establishes these commercial mailboxes.

34. When donations are received, the commercial mailbox providers forward them to Dolores Keezer.

35. Dolores Keezer, acting through FPS, deposits the donations in separate commercial bank accounts established in the name of each charity.

36. The contracts between the charities and FPS authorize FPS to distribute the money in these accounts in accordance with the terms of the charities' contracts with CDG.

37. FPS controls and directs the withdrawals from these bank accounts.

38. The charities do not direct withdrawals from these bank accounts.

39. FPS uses the money in these accounts to pay the costs of the fund-raising campaigns and CDG's profits.

40. FPS pays the remainder, which on average is no more than 15% of the donations, to each charity.

41. In numerous instances, the telephone calls soliciting donations for the charities fail to transmit the telemarketer's telephone number, or the charity's name and customer or donor service telephone number to the prospective donor's caller identification service.

42. In addition, in numerous instances, the telephone calls soliciting donations for the charities are made to persons who previously stated that they did not wish to receive calls made on behalf of the charity.

***Violations of Commission Order***

**COUNT I**

43. In numerous instances, in connection with soliciting charitable contributions by telephone, defendants make representations, expressly or by implication, respecting the purpose for which charitable contributions will be used including, but not limited to:

A. no professional fund-raising company or middleman is involved in the fund-raising campaign to reduce the value of a person's donation to the charity;

B. the telephone solicitor calling for the donation works for the charity;

C. the donation goes directly to the charity;

D. the charity receives 100% of the donation;

E. the charity directs how the entire donation is spent; and

F. a substantial portion of the donation goes to fund the programs or services provided by the charity.

44. In truth and in fact, in numerous instances in which defendants have made these representations:

A. defendants are involved in the fund-raising campaign as professional fund-raisers or middlemen that substantially reduce the value of a person's donation to the charity;

B. the telephone solicitor calling for the donation does not work for the charity;

C. donations do not go directly to the charity;

D. the charity does not receive 100% of the donation;

E. the charity does not direct how the entire donation is spent; and

F. a substantial portion of the donation does not go to fund the programs or services provided by the charity.

45. Therefore, defendants' representations set forth in Paragraph 43 violate Part I of the Order.

**COUNT II**

46. In numerous instances, in connection with soliciting charitable contributions by telephone, defendants make representations, expressly or by implication, material to the decision of a person to make a charitable contribution including, but not limited to, the representations set forth in Paragraph 43.

47. In truth and in fact, in numerous instances in which defendants have made these representations, for reasons including those set forth in Paragraph 44, they have misrepresented facts material to the decision of a person to make a charitable contribution.

48. Therefore, defendants' representations described in Paragraph 46 violate Part III of the Order.

**COUNT III**

49. In numerous instances, in the course of their fund-raising activities, by means,

including but not limited to, those set out in Paragraphs 23-27, defendants provide the means and instrumentalities to, or otherwise assist or facilitate, persons that make representations including, but not limited to the representations set forth in Paragraph 43.

50. Defendants have provided the means and instrumentalities or otherwise have assisted or facilitated persons whom, for reasons including those set forth in Paragraph 44, defendants knew or should have known have made false and misleading representations about the purpose for which charitable contributions will be used, or about other facts material to the decision of a person to make a charitable contribution.

51. Therefore, defendants' practices, as described in Paragraphs 49-50, violate Part VIII of the Order.

***Violations of the Telemarketing Sales Rule***

52. The Commission promulgated the Rule pursuant to Section 6102(a) of the Telemarketing Act, 15 U.S.C.§ 6102(a). The Rule became effective on December 31, 1995. On January 29, 2003, the Commission amended the Rule to implement the "Crimes Against Charitable Americans" provisions of the USA PATRIOT ACT, Pub. L. No. 107-56, 115 Stat. 396 (2001), to, among other things, extend portions of the Rule to cover practices by professional telemarketers to induce charitable contributions through the use of more than one interstate telephone call. These amendments to the Rule became effective March 31, 2003.

53. The Rule prohibits telemarketers from "[m]aking a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution." 16 C.F.R. § 310.3(a)(4).

54. The Rule prohibits telemarketers from misrepresenting "[t]he percentage or amount of any charitable contribution that will go to a charitable organization or to any

particular charitable program." 16 C.F.R. § 310.3(d)(4).

55. The Rule prohibits telemarketers from "[f]ailing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call" or substituting "the name of the . . . charitable organization on behalf of which a telemarketing call is placed, and the . . . charitable organization's customer or donor service telephone number, which is answered during regular business hours." 16 C.F.R. § 310.4(a)(7).

56. The Rule prohibits telemarketers from initiating any outbound telephone call to any person when the person "previously has stated that he or she does not wish to receive an outbound call . . . made on behalf of the charitable organization for which a charitable contribution is being solicited." 16 C.F.R. § 310.4(b)(iii)(A).

57. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the Telemarketing Sales Rule constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

58. Defendants are "telemarketers" engaged in "telemarketing," as those terms are defined in the Rule, 16 C.F.R. §§ 310.2(bb) and (cc).

59. Defendants have knowledge of the Rule or knowledge fairly implied on the basis of objective circumstances.

## COUNT IV

60. In numerous instances, in the course of telemarketing to induce charitable contributions, defendants make representations, directly or by implication, concerning the

percentage or amount of a charitable contribution that will go to a charitable organization including, but not limited to:

A. no professional fund-raising company or middleman is involved in the fund-raising campaign to reduce the value of the person's donation to the charity;

B. the telephone solicitor calling for the donation works for the charity;

C. the donation goes directly to the charity;

D. the charity receives 100% of the donation;

E. the charity directs how the entire donation is spent; and

F. a substantial portion of the donation goes to fund the programs or services provided by the charity.

61. In truth and in fact, in numerous instances in which defendants have made the representations set forth above:

A. defendants are involved in the fund-raising campaign as professional fund-raisers or middlemen that substantially reduce the value of a person's donation to the charity;

B. the telephone solicitor calling for the donation does not work for the charity;

C. donations do not go directly to the charity;

D. the charity does not receive 100% of the donation;

E. the charity does not direct how the entire donation is spent; and

F. a substantial portion of the donation does not go to fund the programs or services provided by the charity.

62. Therefore, defendants' representations alleged in Paragraph 60 misrepresented the percentage or amount of a charitable contribution that will go to a charitable organization in

violation of Section 310.3(d)(4) of the Rule, 16 C.F.R. § 310.3(d)(4).

**COUNT V**

63. In numerous instances, in the course of telemarketing to induce charitable contributions, defendants make representations, directly or by implication, including, but not limited to the representations set forth in Paragraph 60.

64. In truth and in fact, for reasons including those set forth in Paragraph 61, defendants have made false or misleading statements to induce a person to make a charitable contribution in violation of Section 310.3(a)(4) of the Rule, 16 C.F.R. § 310.3(a)(4).

**COUNT VI**

65. In numerous instances, defendants have engaged in telemarketing to induce charitable contributions without having transmitted or caused to be transmitted to a recipient's caller identification service the telemarketer's telephone number and, when made available by the telemarketer's carrier, the telemarketer's name, or substituting the name and customer or donor service telephone number of the charitable organization, which is answered during regular business hours, on behalf of which the telemarketer made the call.

66. Each telemarketing call to induce a charitable contribution without having transmitted or caused to be transmitted to a recipient's caller identification service the telemarketer's telephone number and, when made available by the telemarketer's carrier, the telemarketer's name, or substituting the name and customer or donor service telephone number of the charitable organization, which is answered during regular business hours, on behalf of which the telemarketer makes the call, constitutes a violation of Section 310.4(a)(7) of the Rule, 16 C.F.R. § 310.4(a)(7).

**COUNT VII**

67. In numerous instances, in the course of telemarketing to induce charitable contributions, defendants have initiated outbound telephone calls to persons who had previously stated that they did not wish to receive any outbound call made on behalf of the charitable organization for which the telemarketer solicited a charitable contribution.

68. Each outbound telephone call to persons who had previously stated that they did not wish to receive any outbound call made on behalf of the charitable organization for which the telemarketer is soliciting a charitable contribution constitutes a violation of Section 310.4(b)(iii)(A) of the Rule, 16 C.F.R. § 310.4(b)(iii)(A).

## CONSUMER INJURY

69. Consumers throughout the United States have suffered and continue to suffer substantial monetary loss as a result of defendants' unlawful acts or practices. In addition, defendants have been unjustly enriched as a result of their unlawful practices. Absent injunctive relief by this Court, defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## CIVIL PENALTIES, REDRESS, INJUNCTIVE AND OTHER EQUITABLE RELIEF FOR ORDER AND RULE VIOLATIONS

70. Sections 5(1) and 5(m)(1)(A) of the FTC Act, 15 U.S.C. §§ 45(l) and 45(m)(1)(A), and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 61-5(b), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and Sections 1.98(c), (d), and (m) of the FTC's Rules of Practice, 16 C.F.R. §§ 1.98(c), (d), and (m), authorize this Court to award monetary civil penalties of not more than $11,000 for each violation of the Commission's Order and for each violation of the Rule occurring after November 20, 1996.

71. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize the Court to award such relief as is necessary to redress the injury resulting from defendants' violations of the Telemarketing Sales Rule, including the rescission and reformation of contracts and the refund of monies.

72. Sections 5(1), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(l), 53(b), and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. §6105(b), authorize this Court to issue a permanent injunction against defendants' violations of the Commission's Order, the Telemarketing Sales Rule, and the FTC Act, and to grant ancillary relief, including consumer redress, disgorgement, and restitution to prevent and remedy any violations of any provision of law enforced by the Commission.

73. This Court, in the exercise of its equitable jurisdiction, may award other ancillary relief to remedy the injury caused by defendants' violations of the law.

**PRAYER**

WHEREFORE, plaintiff requests this Court, pursuant to 15 U.S.C. §§ 45(a)(1), 45(l), 45(m)(1)(A), 53(b), 56(a), 57b, 6102(c), and 6105(b), and pursuant to the Court's own equity powers to:

(1) award plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions;

(2) enter judgment against all defendants and in favor of plaintiff for each violation alleged in this Complaint;

(3) enter a permanent injunction to prevent future violations of the Commission

Order, the Rule, and the FTC Act by defendants;

(4) award plaintiff monetary civil penalties from defendants for each violation of the Order and the Rule;

(5) award such relief as the Court finds necessary to redress injury to consumers resulting from defendants' violations of the Order, the Rule, and the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

(6) award plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

DATED: September __, 2007

THE UNITED STATES OF AMERICA:

PETER D. KEISLER
Assistant Attorney General
Civil Division
U.S. Department of Justice

CHRISTOPHER J. CHRISTIE
United States Attorney for the
District of New Jersey

By: ________________________
DANIEL GIBBONS
Assistant U.S. Attorney

EUGENE M. THIROLF
Director
Office of Consumer Litigation

By: ____________________
MARK L. JOSEPHS
SUZETTE A. SMIKLE
Trial Attorneys
Office of Consumer Litigation
Civil Division
U.S. Department of Justice
Washington, D.C. 20530
(202) 305-3630
(202) 514-8742 FAX

OF COUNSEL:

JAMES A. KOHM
Associate Director
Division of Enforcement
Federal Trade Commission

ROBERT S. KAYE
Assistant Director
Division of Enforcement
Federal Trade Commission

JOEL N. BREWER
Attorney
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2967

# Appendix A

Commission Decision and Order