Paul J. Fishman
United States Attorney for the District of New Jersey
Daniel Gibbons
Assistant United States Attorney

By: Mark L. Josephs
Roger Gural
Office of Consumer Litigation
U.S. Department of Justice

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|      ) | |
| Plaintiff,      ) | |
|      ) | |
| v.      ) | Civil Action No. |
|      ) | 2:07-cv-04593-FSH-PS |
|      ) | |
| CIVIC DEVELOPMENT GROUP, LLC,      ) | |
| SCOTT PASCH, and      ) | |
| DAVID KEEZER,      ) | |
|      ) | |
| Defendants.      ) | |

## <u>PLAINTIFF'S TRIAL BRIEF</u>

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 1

II.   ELEMENTS OF THE GOVERNMENT'S CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   EVIDENCE AS TO COUNTS I, II, IV, V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Individuals Making Fundraising Calls Under The PMC Model Were Employees
Of CDG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.   CDG Controlled The Manner And Means By Which Fundraising Calls
Were Made Under The PMC Model . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        2.   CDG Provided The Means And Instrumentalities For Fundraising Calls
And Determined The Location For Work . . . . . . . . . . . . . . . . . . . . . . 10

        3.   Fundraising Was The Regular Work Of CDG . . . . . . . . . . . . . . . . . . . 11

        4.   CDG Provided Employee Benefits To Callers . . . . . . . . . . . . . . . . . . . 11

        5.   Non-Profit Organizations Had Only Transient Relationships With Callers
And Call Center Managers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        6.   Contractual Language Cannot Determine Employment Where The
Substance Of The Relationship Is Inconsistent With That Language . . . 12

    B.   Callers Misrepresented That They Were Employees Of The Non-Profit
Organizations During Fundraising Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.   Callers Misrepresented The Percentage Of Donations Going To The Charity And
The Purpose For Which Charitable Donations Would Be Used . . . . . . . . . . . 13

    D.   Callers Under The PMC Model Falsely Stated That A Professional Fundraiser
Was Not Used For The Fundraising Drive . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.   EVIDENCE AS TO COUNT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.   EVIDENCE AS TO COUNTS V, VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.   The TSR Applies To All Telephone Fundraising Conducted Under The PMC
Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

B.    Defendants Were Telemarketers Under The TSR . . . . . . . . . . . . . . . . . . . . . . . 18

VI.    EVIDENCE AS TO COUNTS VII, VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.    Defendants Violated The TSR By Failing To Transmit Caller ID Information  . 19

B.    Defendants Failed to Place Donors On An Entity-Specific Do-Not-Call List,
Or Contacted Donors After Placing Them On Such List, In Violation Of
The TSR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VII.    DEFENDANTS PASCH AND KEEZER ARE LIABLE FOR THE ORDER AND
TSR VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VIII.    REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Tel. and Tel. Co. v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421 (3d Cir. 1994) ......................................................................... 9

*American Home Prods. Corp. v. Federal Trade Comm'n*,
    695 F.2d 681 (3d Cir. 1983) ....................................................................... 4, 5

*Brown v. Card Serv. Ctr.*,
    464 F.3d 450 (3d Cir. 2006) ....................................................................... 4, 5

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989) ...................................................................................... 9

*Federal Trade Comm'n v. Amy Travel Service, Inc.*,
    875 F.2d 564 (7th Cir. 1989) ...................................................................... 20

*Federal Trade Comm'n v. Bay Area Business Council, Inc.*,
    423 F.3d 627 (7th Cir. 2005) ...................................................................... 21

*Federal Trade Comm'n v. Capital Choice Consumer Credit, Inc.*,
    2004 WL. 5149998 (S.D. Fla. 2004) ......................................................... 4, 5

*Federal Trade Comm'n v. Medical Billers Network, Inc.*,
    543 F. Supp. 2d 283 (S.D.N.Y. 2008) ....................................................... 22

*Federal Trade Comm'n v. Saja*,
    1997 WL 703399 (D. Ariz. Oct. 7, 1997) ................................................. 18

*Federal Trade Comm'n v. World Media Brokers*,
    415 F.3d 758 (7th Cir. 2005) ...................................................................... 20

*Martin v. Selker Bros., Inc.*,
    949 F.2d 1286 (3d Cir. 1991) ....................................................................... 9

*Nationwide Mutual Ins. Co. v. Darden*,
    503 U.S. 318 (1992) ...................................................................................... 9

*Polish Nat'l Alliance v. NLRB*,
    322 U.S. 643 (1944) .................................................................................... 18

*The Broadcast Team, Inc. v. Fed. Trade Comm'n,*
  429 F. Supp. 2d 1292 (M.D. Fla. 2006) ............................................ 19

*United States v. Boston Scientific Corp.,*
  167 F. Supp. 2d 424 (D. Mass. 2001) ............................................ 4, 5

*United States v. Lopez,*
  514 U.S. 549 (1995) ............................................................. 18

*United States v. Reader's Digest Ass'n,*
  662 F.2d 955 (3d Cir. 1981) ................................................. 4, 5, 23

## Statutes and Regulations

15 U.S.C. §§ 45(a)(1) ........................................................... 6, 7, 8

15 U.S.C. §§ 45(l) .................................................................. 23

15 U.S.C. § 45(m)(1)(A) ............................................................ 23

15 U.S.C. § 57a(d)(3) ......................................................... 7, 8, 17

15 U.S.C. § 57b .................................................................... 23

15 U.S.C. § 6102(c) ......................................................... 6, 7, 8, 17

15 U.S.C. § 6105(b) ................................................................ 23

28 U.S.C. § 2461 ................................................................... 23

16 C.F.R. § 310.2(bb) ...................................................... 6, 7, 8, 18

16 C.F.R. § 310.2(cc) ......................................................... 6, 7, 8

16 C.F.R. § 310.3(d)(4) ........................................................ 5, 6, 17

16 C.F.R. § 310.3(a)(4) .......................................................... 6, 17

16 C.F.R. § 310.4(a)(7) ............................................................. 7

68 Fed. Reg. 4643 (2003) .......................................................... 19

# I.  INTRODUCTION AND PROCEDURAL BACKGROUND

In 1998, the Federal Trade Commission ("FTC") brought an administrative action against Defendant Scott Pasch, Defendant David Keezer, Richard McDonnell, Civic Development Group, Inc., and Community Network, Inc., alleging that Pasch, Keezer, McDonnell, and Civic Development Group, LLC's ("CDG") corporate predecessors violated the FTC Act by making misrepresentations about how and where donations had been and would be spent.  To resolve this action, the administrative respondents agreed to the terms of an FTC Consent Order ("FTC Order" or "Order") issued by the FTC on June 5, 1998.

The FTC Order prohibited Defendants from, in connection with a telephone solicitation, misrepresenting, either expressly or by implication:  (1) "the purpose for which charitable contributions have been or will be used"; (2) "the geographic location of the charity, organization or program that has benefitted or will benefit from the charitable contributions"; or (3) "any fact material to the decision of any person to make any charitable contribution."  FTC Order, ¶¶ I-III. The Order required the Defendants to adopt an education and monitoring program that included features enumerated in the Order.  *Id.* ¶ IV.  The Order further stated that if the Defendants adopted such a program, there would be a rebuttable presumption that the administrative respondents "exercised good faith in complying" with Paragraphs I through III of the Order in any action brought by the FTC to enforce the Order.  *Id.* ¶ V.  This rebuttable presumption did not arise in any instance if the Defendants knew or reasonably should have known of violations of the Order.  *Id.*

The Order also prohibited the named parties from providing the means to make misrepresentations in charitable fundraising.  The Order provided:

1

[t]hat respondents, directly or through any corporation, subsidiary, division, or other device, shall not provide means and instrumentalities to, or otherwise facilitate, any person who respondents know makes false or misleading representations about the purpose for which charitable contributions have been or will be used, . . . or any other fact material to the decision of any person to make any charitable contribution.

*Id.* ¶ VIII.  The Order included a number of examples of "assist or facilitate," including the provision or arranging for provision of telephone service or equipment, the provision or arranging for the provision of computer hardware or software, and the provision or assistance with telephone scripts or names of prospective contributors.  *Id.*  The Order applied to Defendants and their employees, agents, and representatives, and applied whether Defendants acted directly or through "any corporation, subsidiary, division, or other device. . . ."  *Id.* ¶¶ I-III.

On September 24, 2007, Plaintiff, the United States, brought this action against Defendants Civic Development Group, LLC, Scott Pasch, and David Keezer pursuant to 15 U.S.C. §§ 45(a)(1), 45(l), 45(m)(1A), 53(b), 56(a), and 57b, to obtain monetary penalties, consumer redress, and injunctive relief relating to violations of the FTC Order and the Trade Regulation Rule Concerning Telemarketing Sales, 15 C.F.R. Part 310 ("Telemarketing Sales Rule" or "TSR").

The alleged violations relate to misrepresentations and misleading[1] statements made during telephone calls soliciting donations to various non-profit organizations under Defendants' so-called "Professional Management Consulting Model" ("PMC Model").  Under the PMC

---

[1]  A statement is misleading if it has two meanings, one of which is false.  *See American Home Prods. Corp. v. Federal Trade Comm'n*, 695 F.2d 681, 687 n.9 (3d Cir. 1983) (citations omitted); *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 455 (3d Cir. 2006) (statement is misleading under Fair Debt Collection Practices Act if it can be reasonably read to have two different meanings, one of which is inaccurate); *Federal Trade Comm'n v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5149998 at *33 (S.D. Fla. 2004) (quoting FTC's *Deception Policy Statement*).

2

Model, Defendants claimed that non-profit organizations undertook telephone fundraising operations with their own employees doing the soliciting.  The government alleges that, in reality, Defendants continued to operate and control telephone fundraising operations, and that the individuals at the call centers were CDG employees.  As a result, many of the statements made during telephone solicitations made under the PMC Model were false and/or misleading and thereby violated the FTC Order and the TSR.  The government further alleges that Defendants violated the TSR by failing to properly transmit caller identification information and by calling donors who had requested that they no longer be called.  These practices violated the do-not-call provisions of the TSR.

The parties engaged in substantial discovery following the filing of the Complaint.  On July 14, 2009, the parties filed motions for summary judgment.  The Court denied these motions on October 8, 2009.

## II.  ELEMENTS OF THE GOVERNMENT'S CASE

In Count I of the Complaint, the government alleges in connection with soliciting charitable contributions by telephone, Defendants made at least six misrepresentations, expressly or by implication, respecting the purpose for which charitable contributions will be used, in violation of Part I of the Order.  To meet its burden under Count I, the government must show:

1. Defendants or their employees or agents, directly or through any corporation, subsidiary, division, or other device, in connection with telephone solicitation made at least one of these statements regarding the purpose for which charitable contributions will be used;

2. The statement was, in any manner, expressly or by implication, a misrepresentation regarding the purpose for which a charitable contribution would be used; and

3

3.      The Order applied to the Defendants.

Order ¶ I; *United States v. Boston Scientific Corp.*, 167 F. Supp. 2d 424, 430 (D. Mass. 2001); *United States v. Reader's Digest Ass'n*, 662 F.2d 955, 960 (3d Cir. 1981). A statement is misleading if it has two meanings, one of which is false. *See American Home Prods. Corp. v. Federal Trade Comm'n*, 695 F.2d 681, 687 n.9 (3d Cir. 1983); *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 455 (3d Cir. 2006); *Federal Trade Comm'n v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5149998 at *33 (S.D. Fla. 2004).

In Count II of the Complaint, the government alleges, in connection with soliciting charitable contributions by telephone, Defendants misrepresented at least six facts material to the decision of a person to make a charitable contribution in violation of Part III of the Order. To meet its burden under Count II, the government must show:

1.      Defendants or their employees or agents, directly or through any corporation, subsidiary, division, or other device, made at least one of these statements in connection with telephone solicitation regarding charitable contributions;

2.      The statement was, in any manner, expressly or by implication, a misrepresentation;

3.      The statement was likely to affect a person's choice of, or conduct regarding, the decision to contribute to a charity; and

4.      The Order applied to the Defendants.

Order ¶ III; *United States v. Boston Scientific Corp.*, 167 F. Supp. 2d 424, 430 (D. Mass. 2001); *United States v. Reader's Digest Ass'n*, 662 F.2d 955, 960 (3d Cir. 1981). A statement is misleading if it has two meanings, one of which is false. *See American Home Prods. Corp. v. Federal Trade Comm'n*, 695 F.2d 681, 687 n.9 (3d Cir. 1983); *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 455 (3d Cir. 2006); *Federal Trade Comm'n v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5149998 at *33 (S.D. Fla. 2004).

In Count III of the Complaint, the government alleges in the course of their fund-raising activities, Defendants provided means and instrumentalities or otherwise assisted or

4

facilitated persons whom Defendants knew or should have known made at least six false and misleading representations about the purpose for which charitable contributions will be used, or about facts material to the decision of a person to make a charitable contribution, in violation of Part VIII of the Order.  To meet its burden under Count III, the government must show:

1.   Defendants or their employees or agents, directly or through any corporation, subsidiary, division, or other device, provided the means and instrumentalities to any person, or otherwise assisted or facilitated any person to make at least one of these representations;

2.   The representation was about the purpose for which charitable contributions have been or will be used; or

3.   The representation was about other facts likely to affect a person's choice of, or conduct regarding, the decision to contribute to a charity; and

4.   The representation made by such persons was false or misleading;

5.   Defendants knew or should have known the statement made by any such person was false or misleading; and

6.   The Order applied to the Defendants.

Order ¶ VIII; *United States v. Boston Scientific Corp.*, 167 F. Supp. 2d 424, 430 (D. Mass. 2001); *United States v. Reader's Digest Ass'n*, 662 F.2d 955, 960 (3d Cir. 1981).  A statement is misleading if it has two meanings, one of which is false.  *See American Home Prods. Corp. v. Federal Trade Comm'n*, 695 F.2d 681, 687 n.9 (3d Cir. 1983); *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 455 (3d Cir. 2006); *Federal Trade Comm'n v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5149998 at *33 (S.D. Fla. 2004).

In Count IV of the Complaint, the government alleges, in the course of telemarketing to induce charitable contributions, Defendants misrepresented the percentage or amount of a charitable contribution that would go to a charitable organization in violation of Section 310.3(d)(4) of the TSR.  To meet its burden under Count IV, the government must show:

1.   Defendants or their employees or agents, conducted a plan, program, or campaign

5

to induce a charitable contribution, by use of one or more telephones and which involved more than one interstate telephone call;

2. Defendants or their employees or agents, in connection with telemarketing, initiated or received telephone calls to or from a customer donor;

3. Defendants or their employees or agents, made at least one of the statements set forth in the Complaint regarding the percentage or amount of a charitable contribution that will go to a charitable organization;

4. The statement was, directly or by implication, a misrepresentation; and

5. The statement was likely to affect a person's choice of, or conduct regarding, the decision to contribute to a charity.

16 C.F.R. § 310.3(d)(4); 16 C.F.R. § 310.2(bb); 16 C.F.R.§ 310.2(cc); 15 U.S.C. § 6102(c); 15 U.S.C. § 57a(d)(3); 15 U.S.C. § 45(a).

In Count V of the Complaint, the government alleges in the course of telemarketing to induce charitable contributions, Defendants made at least six false or misleading statements to induce a person to make a charitable contribution in violation of Section 310.3(a)(4) of the TSR. To meet its burden under Count V, the government must show:

1. Defendants or their employees or agents, conducted a plan, program, or campaign to induce a charitable contribution, by use of one or more telephones and which involved more than one interstate telephone call;

2. Defendants or their employees or agents, in connection with telemarketing, initiated or received telephone calls to or from a customer donor;

3. Defendants or their employees or agents, made at least one of the statements set forth in the Complaint to induce a charitable contribution; and

4. The statement was false or misleading.

16 C.F.R. § 310.3(a)(4); 16 C.F.R. § 310.2(bb); 16 C.F.R.§ 310.2(cc); 15 U.S.C. § 6102(c); 15 U.S.C. § 57a(d)(3); 15 U.S.C. § 45(a).

6

In Count VI of the Complaint, the government alleges Defendants engaged in telemarketing to induce charitable contributions without having transmitted or caused to be transmitted to a recipient's caller identification service, the telemarketer's telephone number and, when made available by the telemarketer's carrier, the telemarketer's name, or substituting the name and customer or donor service telephone number of the charitable organization, on behalf of which the telemarketer made the call.  To meet its burden under Count VI, the government must show:

1.    Defendants or their employees or agents, conducted a plan, program, or campaign to induce a charitable contribution, by use of one or more telephones and which involved more than one interstate telephone call;

2.    Defendants or their employees or agents, in connection with telemarketing, initiated or received telephone calls to or from a customer donor;

3.    Defendants did not transmit or cause to be transmitted to a recipient's caller identification service the telemarketer's telephone number and, when made available by the telemarketer's carrier, the telemarketer's name, or substituting the name and customer or donor service telephone number of the charitable organization on behalf of which the telemarketer made the call.

16 C.F.R. § 310.4(a)(7); 16 C.F.R. § 310.2(bb); 16 C.F.R.§ 310.2(cc); 15 U.S.C. § 6102(c); 15 U.S.C. § 57a(d)(3); 15 U.S.C. § 45(a).

In Count VII of the Complaint, the government alleges in numerous instances, in the course of telemarketing to induce charitable contributions, Defendants initiated outbound telephone calls to persons who had previously stated that they did not wish to receive any outbound call made on behalf of the charitable organization for which the telemarketer solicited a charitable contribution.  To meet its burden under Count VII, the government must show:

1.    Defendants or their employees or agents, conducted a plan, program, or campaign to induce a charitable contribution, by use of one or more telephones and which

7

involved more than one interstate telephone call;

2.     Defendants or their employees or agents, in connection with telemarketing, initiated or received telephone calls to or from a customer donor; and

3.     Defendants or their employees or agents, initiated telephone calls to customer donors who had previously stated that they did not wish to receive any outbound call made on behalf of the charitable organization for which the telemarketer solicited a charitable contribution.

16 C.F.R. § 310.4(b)(iii)(A); 16 C.F.R. § 310.2(bb); 16 C.F.R. § 310.2(cc); 15 U.S.C. § 6102(c); 15 U.S.C. § 57a(d)(3); 15 U.S.C. § 45(a).

### III. EVIDENCE AS TO COUNTS I, II, IV, V

The evidence will show that Defendants repeatedly violated the FTC Order through express and implied misrepresentations made by individuals making fundraising calls under the PMC Model. Under the PMC Model, the callers were, in reality, employees of CDG, just as they were under CDG's traditional professional fundraising operating Model. As evidenced by the scripts that the callers were required to use, these CDG employees made misrepresentations regarding: (1) their employment status; (2) the percentage of donations going to the non-profit organization and its programs; (3) the method in which fundraising expenses were paid; and (4) CDG's involvement in the fundraising. All of these statements —made in hundreds of millions of fundraising calls—violated Paragraph III of the Order and the TSR, and the statements addressing the percentage of donations going to charitable purposes violated Paragraph I of the Order and the TSR.[2]

---

[2] As discussed in Sections IV, V, and VI below, violations occurred regardless of the actual employment status of the callers.

8

A.    **Individuals Making Fundraising Calls Under The PMC Model Were Employees Of CDG**

Try as Defendants might have to convert CDG employees into charity employees in order to increase donations and avoid the scope of federal and state statutes, Plaintiff will present testimony and documents showing that Defendants remained the employers of the callers under the PMC Model. Although these callers may have been charity employees according to their CDG-provided tax forms, the circumstances of PMC Model operations demonstrated that the callers were actually acting as employees of CDG. *See Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)). Whether an individual is an employee of an organization cannot be determined by looking at any one fact; rather it is dependent on the "circumstances of the whole activity," as discussed below. *See Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991).[3]

1.    **CDG Controlled The Manner And Means By Which Fundraising Calls Were Made Under The PMC Model**

The evidence will show that CDG collected, maintained, and provided every phone number that was called. CDG's computer dialer dialed the telephone numbers, and individuals in the call center accessed the resulting calls through a computer system owned, controlled, and provided by CDG. CDG routed all calls through its New Jersey headquarters, as it maintained recordings of all of the calls. Without these systems, not a single call could have been made, and therefore, CDG, and not the non-profit organizations, dictated when call centers could be open.

---

[3] The Third Circuit applied a similar analysis in determining whether an individual is an employee under the Fair Labor Standards Act. *See Martin*, 949 F.2d at 1293. Because the analysis of whether an individual is a principal's agent is substantially similar to the employee analysis, callers under the PMC Model were also Defendants' agents. *See Am. Tel. and Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1434-35 (3d Cir. 1994).

9

Evidence will show that CDG created, revised, and maintained the scripts that callers were required to use in their calls, and arranged for the mailing of pledge kits to donors who agreed to donate. CDG arranged for the means through which callers were paid, largely set callers' pay rates, and was responsible for virtually all human resources functions necessary for the callers. CDG had every reason to control the callers because it was financially responsible for their activities. Not only did CDG's revenue increase with donation amounts, it provided the non-profit organizations with indemnification for anything that occurred in the call centers.

By contrast, the non-profit organizations had little control over the fundraising calls. The so-called overseers of the call centers were "Directors of Fundraising" ("DOFs"), individuals who generally had no experience in fundraising, telemarketing, or management. The DOFs had little knowledge of key aspects of the fundraising operations, and they relied completely on CDG departments and employees to get almost anything done. In reality, DOFs typically were figureheads hired to create the veneer of non-profit organization control. Moreover, call center managers under the PMC Model were generally recruited from CDG call centers and answered to CDG management.

**2.     CDG Provided The Means And Instrumentalities For Fundraising Calls And Determined The Location For Work**

Testimony and documents will show that not a single organization operating under the PMC Model supplied any means or instrumentalities for fundraising. CDG leased the facilities and provided for their maintenance and upkeep. CDG provided all of the office equipment, including the computers, telephone equipment, and furniture. CDG arranged for the utilities for the facilities, such as power and heat, and CDG provided for payroll and employee benefits for

10

the callers. CDG also determined the location of work. Although organizations had some input into location, CDG largely selected the location for the call center facility. Some organizations were dissatisfied with their call center locations, but could do nothing about it.

### 3.     Fundraising Was The Regular Work Of CDG

Defendants have been in the business of fundraising for non-profit organizations for twenty years. CDG was a large company, with several departments containing employees with years of expertise in telephone fundraising and computer systems capable of making, recording, and storing millions of calls. By contrast, non-profit organizations that entered in PMC contracts with CDG generally had not previously engaged in telephone fundraising and were not in the business of fundraising; rather, they were in the business of operating their charitable programs.

### 4.     CDG Provided Employee Benefits To Callers

In every PMC relationship, CDG provided employee benefits—a key indicia of employment. Witnesses will testify that CDG arranged for and provided health insurance to everyone who worked in the call centers, from callers to managers, and CDG-created policies dictated coverage eligibility. Further, CDG arranged for workman's compensation coverage and dealt with unemployment insurance issues, and CDG even provided a grievance line that was answered by CDG employees in New Jersey.

### 5.     Non-Profit Organizations Had Only Transient Relationships With Callers And Call Center Managers

Callers generally worked part-time and performed no other functions for the non-profit organizations. In fact, the evidence will show that callers often had formally worked for CDG prior to becoming callers under the PMC Model and could expect to continue working for CDG

11

after the PMC Model operations ended.  Moreover, managers in PMC Model call centers generally had been CDG callers or managers prior to becoming managers of call centers under the PMC Model.

> ### 6.       Contractual Language Cannot Determine Employment Where The Substance Of The Relationship Is Inconsistent With That Language

The language of the PMC contracts did not create an employment relationship when in practice, there was not.  As CDG effectively acknowledged when pitching the PMC Model, the non-profit organizations simply were not capable of running or controlling a fundraising operation.  The charities did not have the infrastructure, expertise, or resources.  These documents formed the bases for non-profit organizations agreeing to the PMC Model and executing the PMC contracts.  These documents, which were given to charities after PMC Model operations had started elsewhere, assured charities that under this Model, CDG would continue to control the fundraising and charities would have to do no more than they did previously.

No charity ever truly operated or oversaw the fundraising.  There is no evidence to show any charity ever:  (1) created its own office policies (outside of one charity's dress code); (2) created its own scripts; (3) created its own pledge kits; (4) arranged for its own vendors for goods and services necessary for fundraising; (5) possessed its own calling lists; or (6) arranged for its own call center, computers, or office equipment.

> ### B.       Callers Misrepresented That They Were Employees Of The Non-Profit Organizations During Fundraising Calls

The scripts that callers were required to follow under the PMC Model, and which Plaintiff will offer at trial, uniformly stated that the caller was an employee of the non-profit organization.  Whether a caller was an employee of the relevant non-profit organization was, as

acknowledged by Defendants, material to individual decisions to contribute to an organization, and the statement regarding callers' employment was false.

Testimony will show that Defendant Pasch and others at CDG recognized that donors were more likely to donate if they believed that the caller was an employee of the charity, and told charities this was an important reason to adopt the PMC Model. Accordingly, every PMC script contained a statement that the caller was an employee of, or was "directly" employed by, the non-profit organization that was the subject of the call. For the reasons stated above, callers were employees of CDG, and not the charities.

Witnesses who donated to non-profit organizations as a result of PMC Model calls will testify that the employment status of callers was material to their decisions to donate. Moreover, CDG recognized that this fact was important to potential donors by including questions and answers on this subject in PMC Model scripts.[4]

### C.    Callers Misrepresented The Percentage Of Donations Going To The Charity And The Purpose For Which Charitable Donations Would Be Used

Setting aside the issue of the callers' employment status, the evidence will show that callers repeatedly misrepresented the percentage of donations going to the charity and the purposes for which charitable donations would be used. Under the PMC Model, pursuant to the terms of the PMC contracts, charities received no more than 20, and typically between 10 and 15, percent of donations for their charity's programs. Yet PMC Model scripts uniformly directed callers to tell donors that 100 percent of donations went directly to the charity. Further, when the

---

[4] Defendants are not entitled the good faith presumption described in Paragraph IV of the Order. The Order does not make that presumption available if Defendants knew or reasonably should have known of the violations, as was the case here. *See* Sections IV, VII, *infra*.

scripts mentioned costs of the drive, they directed callers to falsely state that the charity paid those expenses "directly." Each of these statements was an express, or at the very least an implied, misrepresentation that violated the Order.

PMC Model scripts stated that 100 percent of donations went to the charity either in the up-front portion of the scripts, meaning as part of the caller's affirmative pitch for a donation, or in the Q and A section. When the language was in the up-front portions of the scripts, it was typically either immediately preceded or followed by statements about the charitable programs of the non-profit organizations, such as financial assistance for the families of killed police officers. Yet only 20 percent or less of the donations actually went to these programs. For example, a script for the Disabled Veterans Association that will be offered at trial stated:

> A 22 year old National Guardsman had both of his legs amputated after an attack in Baghdad. Over 3,000 soldiers have die[d], and tens of thousands have been injured or disabled in Iraq.
>
> Sir/Maam, this summer we are opening a Crisis Services Center to help soldiers returning from Iraq and you'll be glad to know that 100% of your donation goes directly to the Disabled Veterans Association.
>
> Now Mr/Mrs. ___, these proud heroes need your support and to show our thanks, we've designed a special decal that we ask you to display proudly.

These scripts conveyed the impression that 100 percentage of a person's donation—or close to it—goes to financial assistance for families of slain police officers or for wounded servicemen returning from Iraq. Even allowing for some costs of fundraising, no potential donor hearing this statement would receive the accurate impression that a small percentage of his or her donation would fund these charitable programs.[5] In fact, donors will testify that the "100 percent"

---

[5] Nor can a follow-up statement about the costs of the fundraising drive make the 100 percent representation accurate; such statements were not always used to qualify the 100 percent

statements was a key factor in their decision to donate.[6]

CDG's justification for these statements is baseless.  CDG required charities operating under the PMC Model to sign an agreement with FPS, a third party related to CDG, as bank processor.  Charities did not negotiate these contracts; indeed, no charity representatives ever met anyone from FPS prior to signing the contracts.  Defendants will claim that because FPS eventually transferred the donations to a depository account in the name of the non-profit organization, the 100 percent statement was true.  It was not, as evidence will show that charities never had actual control of any of the donations beside the portion that was transferred to the charities' actual bank account to fund their charitable programs.  Further, FPS paid fundraising expenses from the depository account, a process in which no charity official was ever involved.[7] CDG made arrangements with vendors at expense rates known ahead of time only to the vendor and CDG.  Indeed, charity presidents, DOFs, and even treasurers were not aware of how expenses were paid or where donations flowed under the PMC Model, outside of the small percentage that they received for their programs.  In light of how money actually flowed under the PMC Model, references to costs often contained another misrepresentation:  The language in

---

statement, particularly where the 100 percentage language was used in the up-front portion of the script.  Nevertheless, no reference to costs can make the 100 percent statement accurate where 85-90 percent of donations went to purported costs.

[6] Moreover, CDG recognized the materiality of these statements by including them in the "Q and A" sections of the scripts.

[7] The remainder of any donations left in the depository account was transferred to CDG as a purported consulting fee.  The amount depended partially on the total donations, and partially on the level of expenses that were paid to CDG's selected service providers, including FPS.  Because the evidence shows CDG had a financial stake in the donations, CDG had every reason to control the callers to maximize the amount of donations coming in to charities.

15

the Q and A section of scripts at times contained the false statement that the charity paid its

expenses "directly."

### D.    Callers Under The PMC Model Falsely Stated That A Professional Fundraiser Was Not Used For The Fundraising Drive

In response to a question about whether the charity had its own call center, scripts

directed callers to say that the charity "no longer used a paid professional fundraising company."

Further, until the government contacted CDG about CDG's order violations, no script identified

CDG's role in the fundraising, whether in response to a question or otherwise.  Given CDG's

extensive involvement in every aspect of PMC fundraising, as set forth above, to state that a

professional fundraiser was no longer used was to make a misrepresentation.  Simply put, CDG

was and is a professional fundraising company, and CDG was "used" in the fundraising.  And,

Defendants themselves recognized that potential donors cared whether a paid professional

fundraiser was involved because Defendants anticipated the question in their scripts.

### IV.  EVIDENCE AS TO COUNT III

Assuming, *arguendo*, the callers under the PMC Model were employees of the non-profit

organizations, substantial evidence will show that Defendants assisted and facilitated these

callers to make false and misleading statements in violation of Paragraph VIII of the Order.  The

statements described above addressing the percentage of donations going to the charities,

payment of costs, and the absence of a professional fundraising company violated this provision,

and the representations about the employment status of callers were misleading.

CDG made it possible for callers to make calls, regardless of their employment status.

The Order lists several examples of definitions of "assist or facilitate" in the Order, and witness

testimony and documentary evidence will demonstrate that CDG performed every one in the

PMC Model.  CDG "provid[ed] or arrang[ed] for the provision of telephone service or

equipment."  CDG "provid[ed] or arrang[ed] for the provision of computer hardware or

software."  CDG "provid[ed] . . . telephone scripts."  CDG "mail[ed] or arrang[ed] for the

mailing of . . . marketing material," *i.e.*, the donation kits.  Finally, CDG "provid[ed] . . . names

of prospective donors."

The evidence will show that Defendants knew or should have known that callers were

making these false and misleading statements.  Defendants created and maintained the scripts,

and several departments of CDG reviewed each script.  The individual Defendants were also

aware of the nature of the fundraising operations, as they were heavily involved in every aspect,

and created the business Model under which the fundraising was occurring.  Considering these

circumstances, if Defendants did not actually know that callers were making the false and

misleading statements, they surely should have.

## V.  EVIDENCE AS TO COUNTS V, VI

The TSR prohibits false and deceptive statements in connection with charitable

solicitations.  *See* 16 C.F.R. § 310.3(a)(4); 16 C.F.R. 310(d)(4).  Because CDG was a

telemarketer and its activities substantially affected interstate commerce, they violated the TSR.

Such violations constitute deceptive telemarketing acts or practices, in violation of the Federal

Trade Commission Act.  *See* 15 U.S.C. § 6102(c); 15 U.S.C. § 57a(d)(3).

### A.  The TSR Applies To All Telephone Fundraising Conducted Under The PMC Model

The evidence will show that the TSR applies to all fundraising telephone calls made

under the PMC Model because even where calls were made between a call center and potential

donor within the same state, the calls involved a host of interstate activities and transactions.[8]

CDG's computer dialer in New Jersey dialed calls for call centers across the country. CDG's

computer system in New Jersey maintained phone numbers, scripts for callers, and recordings of

calls for call centers across the country. Pledge kits were sent across state lines from CDG's

vendor in New Jersey. Donations were transferred from across the country to a central lockbox

and processed in an FPS facility in New Jersey. Donations were transferred to a bank account in

New Jersey, and money was distributed across state lines from that account to service vendors in

various states, charities, and to CDG. *See Polish Nat'l Alliance v. NLRB*, 322 U.S. 643, 647

(1944); *see also United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *Federal Trade Comm'n v.

Saja*, 1997 WL 703399 (D. Ariz. Oct. 7, 1997) (charitable fundraising affected interstate

commerce in part because pledges were collected by mail over state lines).

### B.    Defendants Were Telemarketers Under The TSR

Regardless of the true employment status of PMC Model callers,[9] CDG was a

telemarketer under the TSR. The TSR defines "telemarketer" as "any person who, in connection

with telemarketing, initiates or receives telephone calls to or from a customer or donor."

16 C.F.R. § 310(bb). The FTC made clear in revising the TSR to incorporate charitable

---

[8] Moreover, several PMC clients were national in scope. In addition, certain call centers at times were located in states different from that of the non-profit organization.

[9] Even if CDG was not a telemarketer, and the PMC callers were not CDG's employees, Defendants violated the TSR through the misrepresentations and misleading statements made during PMC fundraising calls. The TSR prohibits the provision of substantial assistance or support to any telemarketer when the provider knows or consciously avoids knowing that the telemarketer is engaged in making false or misleading statements. 16 C.F.R. § 310.3(b). As established in Section IV, above, Defendants assisted and facilitated PMC fundraising calls.

fundraising that "[a] telemarketer initiates the telephone call by causing the called consumer's telephone to ring." 68 Fed. Reg. at 4643 (2003); *see also The Broadcast Team, Inc. v. Fed. Trade Comm'n*, 429 F. Supp. 2d 1292, 1295-96 (M.D. Fla. 2006).

The evidence will show that under the PMC Model, CDG initiated the fundraising calls. CDG provided the telephone numbers to call, and CDG's computer dialer caused the phone to ring at those telephone numbers. No fundraising call under the PMC Model was possible without CDG.

## VI.  EVIDENCE AS TO COUNTS VII, VIII

### A.  Defendants Violated The TSR By Failing To Transmit Caller ID Information

The evidence will show that though CDG was capable of transmitting Caller ID information, it chose not to do so for many of its PMC clients. CDG did not display a charity "ANI number" on consumer calling ID systems for twenty-eight of its PMC client charities. Moreover, CDG's PMC scripts contained a "Q and A" addressing caller identification requirements, with the question being "WHY DOESN'T YOUR NUMBER DISPLAY ON MY CALLER ID?" CDG's scripts directed callers to respond that "[t]he Telephone Sales Rule exempts nonprofits and political calls from the new caller-id requirements." Because CDG was a telemarketer, these practices violated the TSR.

### B.  Defendants Failed to Place Donors On An Entity-Specific Do-Not-Call List, Or Contacted Donors After Placing Them On Such List, In Violation Of The TSR

Several witnesses will testify that they were solicited for donations to a charity after requesting that they not receive such telephone solicitations. The calls to these witnesses were made under Defendants' PMC Model.

## VII.  DEFENDANTS PASCH AND KEEZER ARE LIABLE FOR THE ORDER AND TSR VIOLATIONS

For an individual to be held liable under the Federal Trade Commission Act, the government must establish:  (1) corporate liability; (2) the individual Defendant participated directly in the practices or acts at issue or had the authority to control them; and (3) the individual Defendant must have known or should have known of the illegal practices and acts at issue. *Federal Trade Comm'n v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).  Plaintiff is not required to prove subjective intent.  Rather, the "knowledge requirement may be fulfilled by showing that the individual 'had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *Id.* at 574 (quoting *Federal Trade Comm'n v. Kitco of Nevada, Inc.,* 612 F. Supp. 1282, 1292 (D. Minn. 1985)).

The corporate Defendant is liable based on the discussion above, and the evidence will show that both Pasch and Keezer participated directly in the practices and acts at issue and had the authority to control them.  Pasch was a co-owner of CDG, and he always retained authority to make decisions, including regarding scripts.  Keezer was also co-owner of CDG, and he, too, always retained decision-making authority over CDG.  Further, Keezer was and is the president, secretary, and treasurer of CDG, a status upon which courts have relied in holding individuals liable under the FTC Act. *See Federal Trade Comm'n v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005).

Documentary and testimonial evidence will show that Defendant Pasch was intimately involved in the creation of the PMC Model, working directly with the Indiana Fraternal Order of

20

Police and others in creating it, and he signed many of the PMC contracts.  Pasch also proposed

the PMC Model to various charities and highlighted its purported benefits, including being able

to tell potential donors that the caller purportedly worked for the non-profit organization.

Pasch was also involved in PMC Model operations.  Documents and witness testimony

will show that Pasch communicated with CDG employees and charity officials regarding scripts,

and he gave direction and made proposals relating to script language, including relating to

language at issue in this case.  Pasch also was involved in communications relating to other

operational issues, such as pay rates.  The top operational officer at CDG, Alyce Cucurullo, and

the head of CDG client services, Lee Ostrowksy, reported to Pasch, and Pasch periodically

discussed important issues relating to CDG with these individuals.

The evidence will also show that Defendant Keezer participated directly in the illegal

practices, as well.  Keezer signed PMC contracts and discussed the benefits of the PMC Model

with various representatives of non-profit organizations.  CDG employees and charity officials

shared scripts with Keezer, and documents will show that he was at times actively involved in

directing that certain script language be used.  Keezer also received emails from top company

managers about PMC Model operations.  Although Keezer lived in Florida for portions of the

relevant time period, he spent summers in New Jersey, during which he engaged in activities

involved in "running the company."  He also was in contact with CDG employees and charities

by email when he was in Florida.  *See Federal Trade Comm'n v. Bay Area Business Council,*

*Inc.*, 423 F.3d 627, 637 (7th Cir. 2005) (individual defendant's presence in a different location

insufficient to shield him for liability when he "received regular e-mails that kept him apprised of

corporate affairs").

The evidence further will show that Defendants Pasch and Keezer were aware, or should have been aware, of the misrepresentations that were made during PMC Model operations. Both Pasch and Keezer were aware of the script language that the government challenges in this case. Both individuals were also generally aware of the nature of PMC Model operations. Pasch participated in the creation of the PMC Model, and was aware of the different ways the Model worked, including that CDG set office policies for PMC call centers, that CDG arranged for the services to perform fundraising at the call centers, and that callers used scripts created from a CDG template. Keezer similarly was aware of PMC Model operations, including the transition to PMC Model operations and script creation.

Given this knowledge, Pasch and Keezer should have been aware of the misrepresentations being made under the PMC Model. The inconsistencies between the PMC Model and certain statements in the scripts were obvious. For example, PMC Model callers made a representation that the 100 percent of the money goes to the charity, yet the contracts that Pasch and Keezer signed dictated that the charity actually received a small percentage of donations. Pasch and Keezer should have been aware that a reasonable donor would have interpreted this representation in a manner that was inconsistent with reality, particularly when Pasch and Keezer were already subject to an FTC Order that addressed misrepresentations and misleading statements.[10]

---

[10] Any purported "good faith" belief that the representations were true is irrelevant if a reasonable donor would draw a false or misleading impression from a representation. *Federal Trade Comm'n v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 321-22 (S.D.N.Y. 2008) ("To the extent that [the individual defendant] is arguing that he had a good-faith belief in the truth of the representation, he is merely asserting a belief in his own interpretation of the representations, an interpretation that differs from the impression that these representations conveyed to a reasonable consumer.")

## VIII.  REMEDIES

The Federal Trade Commission Act, as modified by the Federal Civil Penalties Inflation

Adjustment Act of 1990, authorize the Court to award civil penalties of not more than $11,000

for each violation of the FTC Order and for each violation of the TSR.  15 U.S.C. § 45(l),

45(m)(1)(A), 6105(b); 28 U.S.C. § 2461.  Pursuant to 15 U.S.C. § 45(l) and 15 U.S.C. § 57b, the

Court may award other appropriate relief, including consumer redress or disgorgement.  Finally,

the Court may issue an injunction governing Defendants' future conduct.  15 U.S.C.

§§ 45(l), 57b.

The evidence will show that a substantial penalty is appropriate for Defendants'

violations of the FTC Order and the TSR, pursuant to the factors set forth in *United States v.*

*Reader's Digest Ass'n Inc.*, 662 F.2d 955, 967 (3d Cir. 1981), and 15 U.S.C. § 45(m)(1)(c).  In

addition, the evidence will show that redress of consumer injury is appropriate, and, given

Defendants' past conduct, an injunction governing Defendants' future conduct is warranted.

DATED: January 25, 2010

THE UNITED STATES OF AMERICA:

TONY WEST
Assistant Attorney General
Civil Division
U.S. Department of Justice

PAUL J. FISHMAN
United States Attorney for the
District of New Jersey

DANIEL GIBBONS
Assistant U.S. Attorney

EUGENE M. THIROLF
Director
Office of Consumer Litigation

KENNETH L. JOST
Deputy Director
Office of Consumer Litigation

By:  s/ Mark L. Josephs
     MARK L. JOSEPHS
     ROGER GURAL
     Trial Attorneys
     Office of Consumer Litigation
     U.S. Department of Justice
     P.O. Box 386
     Washington, D.C. 20044
     Phone: (202) 305-3630
     Fax:   (202) 514-8742
     E-mail: mark.josephs@usdoj.gov

OF COUNSEL:

JAMES A. KOHM
Associate Director
Division of Enforcement
Federal Trade Commission

ROBERT S. KAYE
Assistant Director
Division of Enforcement
Federal Trade Commission

MATTHEW WILSHIRE
Attorney
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2967

25

**CERTIFICATE OF SERVICE**

The undersigned hereby acknowledges that the foregoing Plaintiff's Trial Brief was

served electronically, through the Court's ECF system, upon all counsel of record this 25th day

of January, 2010.


s/ Mark L. Josephs
MARK L. JOSEPHS