CLOSED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>Civic Development Group, LLC,<br>CDG Management, LLC,<br>SCOTT PASCH, and<br>DAVID KEEZER;<br>Defendants. | Civil Action No. 2:07-cv-04593-FSH-PS |

**STIPULATED ORDER FOR PERMANENT INJUNCTION AND FINAL JUDGMENT AS TO DEFENDANTS SCOTT PASCH, CIVIC DEVELOPMENT GROUP, LLC, AND CDG MANAGEMENT, LLC**

WHEREAS Plaintiff the United States of America ("United States") filed a Complaint in this matter for civil penalties, consumer redress, injunctive, and other relief (the "Complaint") on September 24, 2007, pursuant to Sections 5, 13, 16, and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45, 53, 56, and 57b, charging violations of a Federal Trade Commission ("FTC" or "Commission") Order and the Telemarketing Sales Rule in connection with the solicitation of charitable donations; and

WHEREAS the United States, the Commission and Defendants Civic Development Group, LLC, CDG Management LLC, and Scott Pasch have consented to the entry of this Stipulated Order for Permanent Injunction and Final Judgment ("Order") to resolve all matters of dispute between them in this action;

NOW, THEREFORE, the United States, the Commission, and Defendants, having requested that the Court enter this Order, and the Court having considered the parties' request, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

FINDINGS

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 53(b).

2. Venue is proper as to all parties in this District.

3. Defendants' activities are in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4. The Complaint states a claim upon which relief may be granted pursuant to Sections 5, 13, 16, and 19 of the FTC Act, 15 U.S.C. §§ 45, 53, 56, and 57b, and the Telemarketing Sales Rule, 16 CFR § 310.

5. Defendants have entered into this Order freely and without coercion. Defendants further acknowledge that they have read the provisions of this Order and are prepared and able to abide by them.

6. The parties agree that this Order resolves all allegations in the Complaint. The parties waive all rights to seek appellate review or otherwise challenge or contest the validity of this Order. Defendants further waive and release any claims they may have against the United States, the Commission, and any employees, representatives, or agents of either.

7. Defendants do not admit to the allegations in the Complaint other than the jurisdictional facts and entry of this Order does not constitute an admission of liability by the Defendants.

8. Defendants agree that this Order does not entitle them to seek or to obtain attorneys' fees as a prevailing party under the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended by Pub. L. 104-121, 110 Stat. 847, 863-64 (1996), and Defendants further waive any right to attorneys' fees that may arise under said provision of law. The parties agree to bear their own costs and attorneys' fees.

9. Entry of this Order is in the public interest.

## DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

A. "Asset" means any legal or equitable interest in, right to, or claim to, any real and personal property, including without limitation, goods, instruments, equipment, fixtures, general intangibles, inventory, checks, and notes (as defined in the Uniform Commercial Code), and all chattels, leaseholds, contracts, shares of stock, lists of consumer names, mail or other deliveries, premises, accounts, funds, credits, receivables, checks, money orders, and cash, wherever located.

B. "Individual Defendant" means Scott Pasch.

C. "Corporate Defendants" means Civic Development Group, LLC, CDG Management, LLC, and their successors and assigns.

D. "Defendants" means the Individual Defendant and the Corporate Defendants, individually, collectively, or in any combination.

E. "Document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, email, electronic communications,

webpages, websites, and other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

F. "Investing" means obtaining an ownership interest of more than one percent of a business entity.

G. "Person" means a natural person, a dealer, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

H. "Telemarketing" means any plan, program or campaign (whether or not covered by the Telemarketing Sales Rule, 16 C.F.R. § 310) that is conducted to induce the purchase of goods or services by means of the use of one or more telephones.

I. "Charitable Solicitation" means the solicitation of money or anything of value for the direct or indirect benefit, in whole or in part, of any entity which is, or is represented to be, a non-profit, or which has, or is represented to have, a charitable purpose, including, but not limited to, any entity that purports to benefit a law enforcement, veterans or firefighting organization(s); law enforcement, veterans, or firefighting personnel; or law enforcement, veterans, or firefighting program(s), regardless of whether the donor receives anything in return.

## ORDER

### I.
### BAN ON TELEMARKETING

IT IS THEREFORE ORDERED that Defendants are permanently restrained and enjoined from engaging or participating in telemarketing, directly or through any intermediary, including, but not limited to, by consulting, brokering, planning, investing, outsourcing, or advertising.

## II.
## BAN ON CHARITABLE SOLICITATION

IT IS HEREBY ORDERED that Defendants are permanently restrained and enjoined from engaging or participating, directly or through any intermediary, including, but not limited to, by consulting, brokering, outsourcing, or planning, in any charitable solicitation, for which they, individually or jointly, receive, attempt to receive, or reasonably would be expected to receive any financial benefit, whether monetary or through the provision of goods or services.

## III.
## INJUNCTION AGAINST MISREPRESENTATION

IT IS HEREBY ORDERED that, in connection with the advertising, marketing, promotion, offering for sale, sale, or distribution of any product or service, Defendants, their officers, agents, servants, contractors, and employees, and those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, whether acting directly or through any intermediary, are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, any false or misleading material representation, including, but not limited to, representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service.

## IV.
## CIVIL PENALTY JUDGMENT

IT IS FURTHER ORDERED that judgment in the amount of eighteen million seven hundred seventy five thousand six hundred and ten dollars ($18,775,610) is hereby entered against Defendants as a civil penalty pursuant to Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A). This judgment is entered as ordered below and in the separate Order entered against Defendant David Keezer.

A. Defendant Pasch is ordered to pay five million eight hundred thousand dollars ($5,800,000) to satisfy his portion of the judgment, which shall be deemed paid as follows:

1. Within five (5) days of entry of this order, Defendant Pasch shall cooperate fully with the Liquidator appointed in Section V of this Order and take such other steps as the Liquidator may require to transfer all rights, title, and interest to the Liquidator, or to the Liquidator's designated trust, the financial accounts listed in Schedule A attached to this Order. The value of the assets in the accounts shall be in the amount listed on Schedule A and on Defendant Pasch's sworn financial statement executed on February 4, 2010, except that the value may differ only to the extent caused by changes to the market value of those assets or accrued interest. Except as set forth in Section V.J of this Order, the costs and expenses of transferring such assets to the Liquidator shall be paid by the Liquidatorship.

2. Defendant Pasch waives all claims to, unconditionally releases, and consents to transfer to the Liquidator, or to his designated trust, possession and legal and equitable title of all personal property listed in Schedule B attached to this Order (the "Personal Property").

3. Defendant Pasch shall cooperate fully with the Liquidator and take such other steps as the Liquidator may require to transfer to the Liquidator, or to his designated trust, possession and legal and equitable title to all such Personal Property within 10 days of request by the Liquidator, including

executing any documents, procuring the signatures of any person or entity under his control, providing access to the Personal Property and any necessary information, and turning over the property. Except as set forth in Section V.J of this Order, the costs and expenses of transferring the Personal Property to the Liquidator shall be paid by the Liquidatorship.

4. Until Defendant Pasch surrenders possession and legal and equitable title of the Personal Property to the Liquidator:

a. Defendant Pasch and Lisa Pasch shall maintain and take no action to diminish the value of the Personal Property, including any structures, fixtures, and appurtenances thereto, in good working order and in the same condition as on the date he executed his sworn financial statement dated February 4, 2010;

b. Defendant Pasch shall remain current on all amounts due and payable on the Personal Property, including but not limited to tax, insurance, maintenance, and similar fees;

c. Defendant Pasch shall cause existing insurance coverage for the Personal Property to remain in force until the surrender of possession and legal and equitable title and shall both notify the insurance carrier(s) immediately of the appointment of the Liquidator and request that the Liquidator and the United States be added to the insurance policy or policies as additional insureds thereunder.

5. Within thirty (30) days of entry of this Order, unless otherwise agreed to in writing by the Liquidator and the United States, Defendant Pasch shall vacate and transfer possession and legal and equitable title to the Liquidator, or to his designated trust, the real property located at 7 Kensington Court, Warren, New Jersey (the "Real Property"). *Provided, however,* that Defendant Pasch may use and occupy the premises at the sole discretion of, and in accordance with the terms set by, the Liquidator, which shall not unduly interfere with the Liquidator's sale of the Real Property.

6. Defendant Pasch shall cooperate fully with the Liquidator and take such other steps as the Liquidator may require to transfer to the Liquidator, or to his designated trust, possession and legal and equitable title to the Real Property, including executing any documents, procuring the signatures of any person or entity under his control, providing access to the Real Property, providing any necessary information, and turning over the Real Property. Except as set forth in Section V.J of this Order, the costs and expenses of transferring the Real Property to the Liquidator shall be paid by the Liquidatorship.

7. Defendant Pasch represents that no encumbrances to the Personal Property or the Real Property have been added since execution of his sworn financial statement on February 4, 2010. Defendant Pasch represents that he will not add any such encumbrances after signing this Order.

Defendant Pasch shall not add any such encumbrances after entry of this Order.

8. As long as they occupy the Real Property, Defendant Pasch and Lisa Pasch shall maintain and take no action to diminish the value of the Real Property, including any structures, fixtures, and appurtenances thereto, in good working order and in the same condition as on the date he executed his sworn financial statement dated February 4, 2010.

9. Until Defendant Pasch transfers possession of the Real Property to the Liquidator:

   a. Defendant Pasch shall remain current on all amounts due and payable on the Real Property, including but not limited to tax, insurance, homeowner's assessments, reasonable and necessary maintenance, and similar fees;

   b. Defendant Pasch shall cause existing insurance coverage for the Real Property to remain in force until the transfer of possession and shall both notify the insurance carrier(s) immediately of the appointment of the Liquidator and request that the Liquidator and the United States be added to the insurance policy or policies as additional insureds thereunder.

10. Nothing in this Order requires Defendant Pasch to pay any amount relating to or concerning the above described Personal or Real Property, including but not limited to any taxes, insurance, homeowner's

assessments, maintenance, and similar fees, after Defendant Pasch has vacated and transferred possession and legal and equitable title of the Personal and Real Property to the Liquidator. The transfer of possession of the Real Property occurs when Defendant Pasch vacates the Real Property in "broom clean condition," delivers all keys and security codes, if any, to the Liquidator along with written notice that possession is surrendered, or has transferred legal and equitable title but remains on the premises pursuant to agreement with the Liquidator as provided in Subparagraph A.5 of this Section.

11. Defendant Pasch waives all claims to, unconditionally releases, and consents to the transfer to the Liquidator by the following corporate entities of possession and legal and equitable title of all their respective assets: Civic Development Group, LLC; CDG Management, LLC; Millennium Teleservices, LLC; Fundraising Processing Center, LLC; National Fundraising Consultants, LLC; National Pharmacy Discounts, LLC; MTSC Management, Inc.; Millennium Teleservices Canada Company; and SPDK, LLC (together, the "Corporations"). Defendant Pasch further assigns to the United States all rights, title, and interest in any claims he has against any of the Corporations and in the membership interest in or capital stock of the Corporations directly or indirectly owned by him.

B. Corporate Defendants are ordered to pay six million six hundred and seventy five thousand six hundred and ten dollars ($6,675,610) to satisfy their portion of the judgment. Corporate Defendants shall make partial payment of this amount as follows:

1. Within five (5) days of entry of this order, Corporate Defendants shall transfer all rights, title, and interest to the Liquidator appointed in Section V of this Order, or to his designated trust, the financial accounts listed in Schedule C attached to this Order. The value of the assets in the accounts shall be the amount listed on Schedule C and on Corporate Defendant Civic Development Group, LLC's sworn financial statement executed on February 4, 2010, as amended on February 25, 2010, except that the value may differ only to the extent caused by changes to the market value of those assets or accrued interest since February 22, 2010.

2. Corporate Defendants shall cooperate fully with the Liquidator and take such other steps as the Liquidator may require to transfer to the Liquidator, or to his designated trust, legal and equitable title to (subject to any interest(s) of any third party), and possession of any and all assets described in Schedule C within 5 days of request by the Liquidator, including executing any documents, procuring the signatures of any person or entity under their control, providing any necessary information, and turning over any property.

3. In the event a petition for relief under the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, is filed by or against the Corporate Defendants or either of

them before the transfers of assets required by subparagraphs IV.B.1 and IV.B.2 above occur, those subparagraphs shall not take effect unless and until the bankruptcy court grants relief from the automatic stay pursuant to 11 U.S.C. § 362(d). In the event of such a bankruptcy filing, to the maximum extent permissible under law, the Corporate Defendants agree that the United States shall be entitled to seek and obtain relief from the automatic stay, and that any rights the Corporate Defendants may have to object to, stay, oppose, or interfere with obtaining such relief, including any rights under 11 U.S.C. §§ 105 and 362, are hereby released and waived. The Corporate Defendants further acknowledge and agree that the value of the assets listed in Schedule C is less than the amount of the judgment owing to the Commission.

C. Defendant Pasch's spouse, Lisa Pasch, waives all claims to, unconditionally releases, and consents to transfer to the Liquidator possession and legal and equitable title of all assets referenced in this Section IV. Lisa Pasch shall cooperate fully with the Liquidator and take such other steps as the Liquidator may require to transfer to the Liquidator, or to his designated trust, any and all of the assets referenced in this Section IV, including executing any documents, procuring the signatures of any person or entity under her control, providing access and any necessary information, and turning over such assets.

D. Defendants shall cooperate fully with the United States and the Commission and their agents in all attempts to collect the amounts due and effectuate the transfer of assets required pursuant to this Section. If Defendants fail to pay fully the amount due or make the

required transfers of assets at the time specified herein, then in addition to any other remedies available, Defendants agree to provide the United States and the Commission with their federal and state tax returns for the preceding two years, and to complete standard financial disclosure forms fully and accurately within ten (10) business days of receiving a request from the United States or the Commission to do so. In such an event, Defendants further authorize the United States and the Commission to verify all information provided on their financial disclosure forms with all appropriate third parties, including but not limited to financial institutions.

E. In accordance with 31 U.S.C. § 7701, Defendants are required, unless already provided, to furnish to the United States and the Commission with their taxpayer identification numbers (employer identification number), which shall be used for purposes of collecting and reporting on any delinquent amount arising out of their relationship with the government.

F. Defendants relinquish all dominion, control, and title to the assets described in this Section IV and in Schedules A, B, and C to the fullest extent permitted by law. Defendants shall make no claim to nor demand return of the assets, directly or indirectly, through counsel or otherwise.

G. This judgment represents a civil penalty owed to the United States Government, and is not compensation for actual pecuniary loss, and, therefore, is not subject to discharge under the Bankruptcy Code pursuant to 11 U.S.C. § 523(a)(7). For purposes of this Section, Defendants waive any right to contest any of the allegations in the Complaint in any subsequent civil litigation filed by or on behalf of the Commission or the United States to enforce their rights to any payment or money judgment pursuant to this Order.

H. Proceedings instituted under this Section are in addition to, and not in lieu of, any other civil or criminal remedies that may be provided by law, including any other proceedings the United States or the Commission may initiate to enforce this Order.

## V.
## APPOINTMENT AND DUTIES OF LIQUIDATOR RECEIVER

IT IS FURTHER ORDERED THAT Richard Trenk, Esq. of Trenk, DiPasquale, PC, 347 Mount Pleasant Avenue, Suite 300, West Orange, New Jersey is appointed as Liquidator Receiver ("Liquidator") with all the rights and powers of an equity receiver, over the Real Property described in Section IV.A.5 of this Order and all property listed in Attached Schedules A, B, and C (collectively, the "Property").

A. As soon as reasonably possible, the Liquidator shall, at reasonable cost and in a commercially reasonable fashion, liquidate the Property. In liquidating the accounts listed in Schedules A and C, the Liquidator shall pay any necessary brokerage fees and taxes from the proceeds. After all of the Property has been liquidated, the Liquidator shall account for the net proceeds derived, and transfer all such net proceeds to the United States. The Liquidator shall make the transfer required by this paragraph by electronic fund transfer or certified or cashier's check in accordance with instructions provided by the Office of Consumer Litigation, Civil Division, U.S. Department of Justice, Washington, D.C. 20530.

B. Upon transfer of legal and equitable title and possession the Liquidator is authorized to assume responsibility for management of the Property, including but not limited to making disbursements for operating expenses as may be appropriate, undertaking repairs, and taking any other actions necessary to efficiently manage the Property and to maintain its value.

C. The Liquidator shall take all necessary action to procure appropriate insurance for the Property, naming the Liquidator and the United States as insureds. The Liquidator may as an option keep in force the existing insurance coverage(s), each of which shall name the United States and the Liquidator as additional insureds thereunder.

D. The Liquidator shall have all necessary powers to operate and otherwise manage the Property including, without limitation, the following powers and responsibilities:

1. to take possession of the Property;

2. to supervise and oversee the management of the Property, including making payments and paying taxes as and when the Liquidator has funds available from the Property, or from the liquidation of the Property;

3. to employ such counsel, real estate agents, auctioneers, appraisers, accountants, contractors, other professionals, and other such persons as may be necessary in order to carry out his duties as Liquidator and to preserve, maintain, and protect the Property;

4. to determine or abrogate, in the Liquidator's sole sound business discretion, any or all agreements, contracts, understandings or commitments entered into by any Defendant with respect to the Property to the extent permitted by applicable law;

5. to open new accounts with, or negotiate, compromise or otherwise modify the Defendants' existing obligations with third parties, including utility companies, other service providers or suppliers of goods and services related to the Property, and to otherwise enter into such agreements,

contracts, or understandings with such third parties as are necessary to maintain, preserve, and protect the Property;

6. to open new bank accounts with respect to the Liquidator's management and operation of the Property; and

7. to apply to this Court for further directions and for such further powers as may be necessary to enable the Liquidator to fulfill his duties.

E. The Liquidator shall keep a true and accurate account of any and all receipts and expenditures and periodically file with the Court a Liquidatorship Report under oath, accurately identifying all such revenues received and expenditures made, including adequately detailed information concerning income, expenses, payables and receivables. These periodic filings shall be served by the Liquidator on the Commission, the United States, Defendants, and their respective counsel.

F. The Defendants and their agents, employees or other representatives are enjoined from interfering in any manner with the Liquidator's management and operation of the Property and the Defendants and their agents, employees or other representatives are enjoined and restrained from collecting any rents or profits which are now or hereafter become due with respect to all or any portion of the Property and from interfering in any way with United States' or the Liquidator's collection of such rents or profits.

G. The Liquidator shall not be bound by all or any unsecured contracts, agreements, understandings or other commitments in the nature of service contracts the Defendants had, have or may have with third parties with respect to the Property, whether oral or written, and the Liquidator shall be authorized, by affirmative written ratification executed by the Liquidator, to

agree to become bound by any such contracts, agreements, understandings or other commitments, or may agree to enter into new or amended contracts, agreements, understandings or other commitments.

H. Any and all sums collected by the Liquidator over and above those necessary to manage the Property or those necessary to make payments authorized by this Order shall be paid to the United States as directed by the United States.

I. The Liquidator is entitled to reasonable compensation for the performance of duties undertaken pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by him. The Liquidator's compensation and the compensation of any persons hired by him are to be paid solely from the Property and the proceeds of the sale of the Property, and such payments shall have priority over all other distributions except for any transfer fees, recording fees, or other payments owed through the transfer of the Property at the time of its sale.

J. The Liquidator shall file with the Court and serve on the parties a request for the payment of reasonable compensation at the time of the filing of periodic reports and no less than every sixty (60) days. The Liquidator shall not increase the fees or rates used as the bases for such fee applications without prior approval of the United States and the Court. The Defendants shall have no right to object to the Liquidator's fees or compensation. Absent a violation of this Order that causes the Liquidator to incur fees or expenses, Defendants shall not be liable for the Liquidator's fees or expenses beyond the amount paid pursuant to Section IV.

K. Upon the final transfer of all funds to the United States pursuant to this Section V the duties of the Liquidator shall terminate. The Liquidator shall file his final application for fees, complete liquidation, and terminate his service within 270 days of the execution of this

Order, unless good cause is shown to extend beyond 270 days. At the termination of Liquidator's duties, the Liquidator shall transfer any unliquidated right, title, and interest in the Property to the United States.

## VI.
## CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Defendants, and their agents, servants, and employees, and all other persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, are permanently restrained and enjoined from:

A. disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), of any person which any Defendant obtained prior to entry of this Order in connection with any charitable solicitation or for-profit telemarketing in which Corporate Defendants were wholly or partially involved.

B. failing, within fourteen (14) days after entry of this Order, to transfer possession of all such customer information related to charitable solicitation to the United States (subject to any legally valid interests of third parties). This transfer shall be made in accordance with instructions provided by the Office of Consumer Litigation, Civil Division, U.S. Department of Justice, Washington, D.C. 20530. Defendants must either destroy or return to the rightful owner all other customer information in their possession within fourteen (14) days after entry of this Order.

VII.
COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purposes of monitoring and investigating compliance with any provision of this Order:

A. Within ten (10) business days of receipt of written notice from a representative of the Commission or the United States, Defendants each shall submit additional written reports, which are true and accurate and sworn to under penalty of perjury; produce documents for inspection and copying; appear for deposition; and provide entry during normal business hours to any business location in each Defendant's possession or direct or indirect control to inspect the business operation;

B. In addition, the Commission and the United States are authorized to use all other lawful means, including but not limited to:

1. obtaining discovery from any person, without further leave of court, using the procedures prescribed by Fed. R. Civ. P. 30, 31, 33, 34, 36, 45 and 69;

2. having their representatives pose as consumers and suppliers to Defendants, their employees, or any other entity managed or controlled in whole or in part by any Defendant, without the necessity of identification or prior notice; and

C. Defendants each shall permit representatives of the Commission and the United States to interview any employer, consultant, independent contractor, representative, agent, or employee who has agreed to such an interview, relating in any way to any conduct subject to this Order. The person interviewed may have counsel present. *Provided however,* that nothing in this Order shall limit the Commission's or the United States' lawful use of compulsory process,

pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to obtain any documentary material, tangible things, testimony, or information relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of 15 U.S.C. § 45(a)(1)).

## VIII.
## COMPLIANCE REPORTING

IT IS FURTHER ORDERED that, in order that compliance with the provisions of this Order may be monitored:

A. For a period of five (5) years from the date of entry of this Order,

1. Individual Defendant shall notify the Commission of the following:

a. Any changes in such Defendant's residence, mailing addresses, and telephone numbers, within ten (10) days of the date of such change;

b. Any changes in such Defendant's employment status (including self-employment), and any change in such Defendant's ownership of more than one percent of any business entity within ten (10) days of the date of such change. Such notice shall include the name and address of each business that such Defendant is affiliated with, employed by, creates or forms, or performs services for; a detailed description of the nature of the business; and a detailed description of such Defendant's duties and responsibilities in connection with the business or employment; and

c. Any changes in such Defendant's name or use of any aliases or fictitious names within ten (10) days of the date of such change;

2. Defendants shall notify the Commission of any changes in structure of Corporate Defendants or any business entity that any Defendant directly or indirectly controls, or has a more than one percent ownership interest in, that may affect compliance obligations arising under this Order, including but not limited to: incorporation or other organization; a dissolution, assignment, sale, merger, or other action; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; or a change in the business name or address, at least thirty (30) days prior to such change, *provided* that, with respect to any such change in the business entity about which a Defendant learns less than thirty (30) days prior to the date such action is to take place, such Defendant shall notify the Commission as soon as is practicable after obtaining such knowledge.

B. One hundred eighty (180) days after the date of entry of this Order and annually thereafter for a period of eight (8) years, Defendants each shall provide a written report to the Commission, which is true and accurate and sworn to under penalty of perjury, setting forth in detail the manner and form in which they have complied and are complying with this Order. This report shall include, but not be limited to:

1. For Individual Defendant:

a. Defendant's then-current residence address, mailing addresses, and telephone numbers;

b. Defendant's then-current employment status (including self-employment), including the name, addresses, and telephone numbers of each business that Defendant is affiliated with, employed by, or performs services for; a detailed description of the nature of the business; and a detailed description of Defendant's duties and responsibilities in connection with the business or employment; and

c. Any other changes required to be reported under Subsection A of this Section.

2. For all Defendants:

a. A copy of each acknowledgment of receipt of this Order, obtained pursuant to the Section titled "Distribution of Order;" and

b. Any other changes required to be reported under Subsection A of this Section.

C. Each Defendant shall notify the Commission of the filing of a bankruptcy petition by such Defendant within fifteen (15) days of filing.

D. For the purposes of this Order, Defendants shall, unless otherwise directed by the Commission's authorized representatives, send by overnight courier all reports and notifications required by this Order to the Commission, to the following address:

Associate Director for Enforcement
Bureau of Consumer Protection
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
RE: FTC v. Civic Development Group et al., C3810

*Provided* that, in lieu of overnight courier, Defendants may send such reports or notifications by first-class mail, but only if Defendants contemporaneously send an electronic version of such report or notification to the Commission at: DEBrief@ftc.gov.

E. For the purposes of this Order, Defendants and the Liquidator shall, unless otherwise directed in writing by a representative of the United States, identify all written notifications or other material required to be sent to the United States, as in reference to DJ# 102-3399, and send them by overnight courier to:

Director, Office of Consumer Litigation
U.S. Department of Justice - Civil Division
450 Fifth Street, NW, Suite 6400
Washington, DC 20001

F. For purposes of the compliance reporting and monitoring required by this Order, the Commission and the United States are authorized to communicate directly with each Defendant.

IX.
RECORDKEEPING

IT IS FURTHER ORDERED that, in connection with the advertising, marketing, promotion, offering for sale, sale, or distribution of any product or service, for a period of ten (10) years from the date of entry of this Order, Corporate Defendants, and Individual Defendant for any business for which he, individually or collectively, is the majority owner or directly or indirectly controls, are hereby restrained and enjoined from failing to create and retain the following records:

A. Accounting records that reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues;

B. Personnel records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for the person's termination, if applicable;

C. Customer files containing the names, addresses, phone numbers, dollar amounts paid, quantity of items or services purchased, and description of items or services purchased, to the extent such information is obtained in the ordinary course of business;

D. Complaints and refund requests (whether received directly or indirectly, such as through a third party,) and any responses to those complaints or requests;

E. Copies of all sales scripts, training materials, advertisements, or other marketing materials; and

F. All records and documents necessary to demonstrate full compliance with each provision of this Order, including but not limited to, copies of acknowledgments of receipt of this Order required by the Sections titled "Distribution of Order" and "Acknowledgment of Receipt of Order" and all reports submitted to the Commission pursuant to the Section titled "Compliance Reporting."

## X.
## DISTRIBUTION OF ORDER

IT IS FURTHER ORDERED that, for a period of five (5) years from the date of entry of this Order, Defendants shall deliver copies of the Order as directed below:

A. Corporate Defendants: Corporate Defendants must deliver a copy of this Order to (1) all of their principals, officers, directors, and managers; (2) all of their employees, agents, and representatives who engage in conduct related to the subject matter of the Order; and (3) any

business entity resulting from any change in structure set forth in Subsection A.2 of the Section titled "Compliance Reporting." For current personnel, delivery shall be within five (5) days of service of this Order upon such Defendant. For new personnel, delivery shall occur prior to them assuming their responsibilities. For any business entity resulting from any change in structure set forth in Subsection A.2 of the Section titled "Compliance Reporting," delivery shall be at least ten (10) days prior to the change in structure.

B. Individual Defendant as control person: For any business that Individual Defendant controls, directly or indirectly, or in which such Defendant has a majority ownership interest, such Defendant must deliver a copy of this Order to (1) all principals, officers, directors, and managers of that business; (2) all employees, agents, and representatives of that business who engage in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure set forth in Subsection A.2 of the Section titled "Compliance Reporting." For current personnel, delivery shall be within five (5) days of service of this Order upon such Defendant. For new personnel, delivery shall occur prior to them assuming their responsibilities. For any business entity resulting from any change in structure set forth in Subsection A.2 of the Section titled "Compliance Reporting," delivery shall be at least ten (10) days prior to the change in structure.

C. Defendants must secure a signed and dated statement acknowledging receipt of the Order, within thirty (30) days of delivery, from all persons receiving a copy of the Order pursuant to this Section.

XI.
ACKNOWLEDGMENT OF RECEIPT OF ORDER

IT IS FURTHER ORDERED that each Defendant, within five (5) business days of receipt of this Order as entered by the Court, must submit to the Commission a truthful sworn statement acknowledging receipt of this Order.

XII.
SEVERABILITY

IT IS FURTHER ORDERED that if and to the extent that any provision in this Order is determined to be void or unenforceable as to any Defendant, then as to that Defendant that provision shall be deemed severable from the remaining provisions of this Order, which shall remain in full force and effect.

XIII.
RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

SO ORDERED this 29th day of March 2010.

THE HONORABLE FAITH S. HOCHBERG
UNITED STATES DISTRICT JUDGE
United States District Court for the
District of New Jersey

**STIPULATED AND AGREED TO:**

**FOR THE COMMISSION:**

JAMES A. KOHM,
Associate Director,
Division of Enforcement

ROBERT S. KAYE,
Assistant Director,
Division of Enforcement

MATTHEW J. WILSHIRE, Attorney
Federal Trade Commission
Division of Enforcement
600 Pennsylvania Ave., N.W.
NJ-2122
Washington, D.C. 20580

202-326-2976 (tel)
202-326-2558 (fax)
mwilshire@ftc.gov

WILLARD K. TOM
General Counsel
**FOR THE PLAINTIFF**
**THE UNITED STATES OF AMERICA:**

TONY WEST
Assistant Attorney General
Civil Division
U.S. Department of Justice

PAUL J. FISHMAN
United States Attorney for the
District of New Jersey

Daniel Gibbons / by MJT
DANIEL GIBBONS
Assistant U.S. Attorney

**FOR THE DEFENDANTS:**

MATTHEW OLIVER
Lowenstein Sandler PC
65 Livingston Ave.
Roseland, New Jersey 07068
973-597-2500
Attorneys for Defendants

Scott M. Pasch, individually and
as Vice President of Civic Development
Group, LLC and President of CDG
Management, LLC

Lisa Pasch, as to Sections IV.A, IV.C and
V.F only

EUGENE M. THIROLF
Director
Office of Consumer Litigation

KENNETH L. JOST
Deputy Director
Office of Consumer Litigation

MARK L. JOSEPHS
ROGER GURAL
Trial Attorneys
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
Phone: (202) 305-3630
Fax: (202) 514-8742
E-mail: mark.josephs@usdoj.gov

**SCHEDULE A (Financial Accounts - Pasch)**

| | | Balance as of 2-04-2010 |
|---|---|---|
| 1. | Wells Fargo Advisors Account Number [redacted]8113. | $56,510 |
| 2. | Wells Fargo Advisors Account Number [redacted]7282. | $0 |
| 3. | Wells Fargo Advisors Account Number [redacted]7285. | $0 |
| 4. | Wells Fargo Advisors Account Number [redacted]9958. | $108,736 |
| 5. | Wells Fargo Advisors Account Number [redacted]1151. | $93,024 |
| 6. | UBS Account Number [redacted]46WM. | $205,340 |
| 7. | UBS Account Number [redacted]847. | $59,155 |
| 8. | UBS Account Number [redacted]43WM. | $2,283 |
| 9. | Additional payment to account for (a) FTC's consent to Defendant Pasch turning over primary residence in settlement rather than secondary residence, as set forth in the Certification executed by the parties on January 28, 2010, and (b) interim withdrawals from accounts | $236,084 |

## SCHEDULE B (PERSONAL PROPERTY)

1. All vehicles identified in Item 21 of Defendant Pasch's sworn financial statement ("financial statement") and Exhibit L thereto:

   A. 2004 Mercedes Benz model CLK320, VIN: WW200916100004182;

   B. 2002 Mercedes Benz model G500, VIN: WW200933600009523;

   C. 2007 Mercedes Benz model B, VIN: J4RV20063040478; and

   D. 2006 Bentley model Flying Spur, VIN: WW200928200004375.

2. The net proceeds from the auction sale of the wine collection identified in Item 20 of the financial statement as described in the Auction Proposal attached thereto as Exhibit G and attached to this Schedule as Exhibit 1. Defendant Pasch represents that upon signing this Order he will direct the auction company in writing to hold and transfer the sale proceeds directly to the Liquidator after entry of the Order.

3. The guitar collection identified in Item 20 of the financial statement as described in Exhibits H and I thereto and attached to this Schedule at Exhibit 2.

4. The pieces of jewelry described in numbered paragraphs 1, 2, 8, 9, 10, 11, 12, 13 and 14 in Item 20 of the financial statement and Exhibit K thereto attached to this Schedule as Exhibit 3.

5. The artwork or net sale proceeds of the artwork identified in Item 20 of the financial statement described in Exhibits D and E thereto and attached to this Schedule as Exhibit 4. Defendant Pasch represents that immediately upon receipt of the proceeds from the auction sale of the artwork described in Exhibit D, he will transfer the proceeds to Lowenstein Sandler to hold in escrow, and upon entry of the Order, Lowenstein Sandler will transfer those funds to the Liquidator in accordance with the Order and as directed by the Liquidator. As to the artwork identified in Exhibit E on consignment at the time Defendant Pasch signs this Order, Defendant Pasch represents that if the artwork is sold he will direct the art gallery in writing to hold and transfer the net sale proceeds directly to the Liquidator after entry of the Order.

6. All right, title, and interest Defendant Pasch may have in any remaining retainers for legal services, including any retainers held by Lowenstein Sandler, PC, after accounting for work performed prior to the date of entry of the Order.

7. All right, title, and interest Defendant Pasch may have to interest or payments made in connection with any loan or investment to or in Financial Processing Services, Dolores Keezer, or both, including any payments or assets received in connection with such loan or investment after Defendant Pasch signs this Order.

**Pasch Schedule B**
**Exhibit 1**

**Item 20.** **Personal Property**

List all personal property, by category, whether held for personal use or for investment, including but not limited to, furniture and household goods of value, computer equipment, electronics, coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
| Artwork | Scott & Lisa Pasch | Warren NJ Residence | $ 2,500,000 | $ ~1,400,000 |
| Artwork (continued from above) | Scott & Lisa Pasch | Consigned in London and FL | $ included | $ included |
| Wine | Scott & Lisa Pasch | Consigned to Zachy's | $ Unknown | $ ~250,000 |
| Guitars | Scott & Lisa Pasch | Warren NJ Residence | $ Unknown | $ ~700,000 |
| Jewelry | Scott & Lisa Pasch | Warren NJ Residence | $ 700,000 | $ ~300,000 |
| See Exhibits D-K for lists of | property and | valuation support | $ | $ |

**Item 21.** **Cars, Trucks, Motorcycles, Boats, Airplanes, and Other Vehicles**

List all cars, trucks, motorcycles, boats, airplanes, and other vehicles owned or operated by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

▸Vehicle Type Car Make Mercedes Benz Model CLK320 Year 2004

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200916100004182

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ ~50,000 Current Value $ ~20,000 Retail Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A

▸Vehicle Type Car Make Mercedes Benz Model G500 AWD Year 2002

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200933600009523

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ 77,000 Current Value $ ~25,000 Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A



Initials ______

## ATTACHMENTS

**Item 33. Documents Attached to this Financial Statement**

List all documents that are being submitted with this financial statement.

| Item No. Document Relates To | Description of Document |
|---|---|
| 9 | Supplement Pending Lawsuits (Exhibit A) |
| 12,13,14,19,29 | Financial Information (Cash, Securities, etc.) (Exhibit B) |
| 18 | Supplement Life Insurance (Exhibit C) |
| 20 | Artwork list and valuations (Exhibits D-F) |
| 20 | Wine list and valuations (Exhibit G) |
| 20 | Guitar list and valuations (Exhibits H-J) |
| 20 | Jewelry list (Exhibit K) |
| 21 | Supplement Car Information (Exhibit L) |
| 22 | Home valuations (Exhibits M-N) |
| 27 | 2006-2008 Personal Income Tax Returns |

I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court. I have used my best efforts to obtain the information requested in this statement. The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge. I have provided all requested documents in my custody, possession, or control. I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines). I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

2/4/10
(Date)

Signature [signature]



Initials [initials]

# EXHIBIT G

**ZACHYS WINE AUCTIONS, INC.**
**39 Westmoreland Ave.**
**White Plains, NY 10606**
**Ph: (914) 448-3026 Fax: (914) 206-4544**

**Date:** November 20, 2009

**Seller:** Scott and Lisa Pasch

**Address:** 7 Kensington Court
Warren, NJ 07059

**CONSIGNMENT CONTRACT**

This Agreement (this "Agreement"), dated as of the date set forth above, is by and between ZACHYS WINE AUCTIONS, INC a New York Corporation having an address at 39 Westmoreland Ave, White Plains, New York 10606 ("ZA") and the above referenced Seller, having an address as set forth above ("Seller").

1. **Consignment**. Seller appoints ZA as the sole and exclusive sales agent to auction the products listed on Schedule A hereto (the "Products") which Schedule A may be amended or supplemented from time to time as so noted in paragraph 5 below (the "Products"). Seller hereby consigns to ZA the Products for auction by ZA in accordance with this Agreement and the Conditions of Sale and Information for Buyers in effect at the time of any applicable auction.

2. **Commissions**. Consignment commission will be 2% of the final hammer.

3. **Product Delivery**. Seller shall deliver the Products to such location as ZA shall designate, or shall make the Products available for pickup, no later than 60 days prior to the scheduled date of the initial auction in which ZA intends to include the Products. Seller shall also provide ZA with itemized inventory of Products to be picked up by or delivered to ZA. Itemized inventory will be subject to confirmation by ZA once Products are received in ZA's warehouse. Delivery of Products without itemized inventory will forfeit any and all claims by Seller regarding alleged delivery of Product in whole or in part. ~~Upon request, ZA may recommend a carrier/packer, provided, that ZA shall have no liability therefore, and all packing, transporting, delivering and insuring of the Products will be at Seller's sole expense and risk. ZA shall arrange for storage on behalf of any Products delivered to ZA, and at no expense to Seller (except as provided in paragraph 9(b)). If ZA agrees to Seller's request to pick up Products, Seller will pay ZA all costs and expenses associated therewith including the cost of all packing materials, and trip expenses incurred by ZA for onsite inspection/inventory. The cost of which will be deducted from payments owed by ZA to Seller. Seller will also be responsible for all costs of boxes needing to be replaced to ensure proper storage as ZA sees fit.~~ ZA will provide transportation of Products to their warehouse(s) at no cost to Seller.

4. **Method of Sale**. ZA shall have complete discretion as the place, date and manner of sale, the Conditions of Sale, the illustration, and/or the description of the Products in its catalogues or other literature, and the combination or division of the Products into such lots and/or separate auctions as ZA shall determine. ZA may, in its sole discretion, sell the Products in Los Angeles with ZA Auctions Inc, in Hong Kong or on the Internet. Selling the wines in Los Angeles, Hong Kong or on the internet does not change any aspect of this contract.

5. **Estimates and final inventory**. Any appraisal, estimate or other statement of value by ZA or its representatives with respect to the estimated value or selling price of any Product ("Estimates"), whether made orally or in any writing, are opinions of ZA based on recent market value for Product in Excellent Condition. Estimates shall not be relied upon by Seller or any third party as a prediction or guarantee of the actual selling price, and in no event shall ZA be liable for the failure of any Product to be sold at any such Estimate or the reserve price therefore. ZA reserves the right to change Estimates at any time before a sale based on any considerations deemed relevant by ZA. At ZA's sole discretion, following physical inspection of inventory, ZA will provide Seller with notice of any items not previously represented, items represented but not delivered to ZA or with an updated schedule A; provided, however, that any such Estimates on items not previously represented will be subject to the provisions hereof.

6. **Reserves**. All Products will be sold subject to a reserve, which is the minimum price below which the Product will not be sold. Reserves are set at 80% of the low estimate (90% if in original wooden case), and then rounded down to the nearest bidding increment, or as otherwise agreed. In any case, reserves will not be greater than the low estimate. All reserves will be held in confidence by ZA. If bidding does not reach the reserve on any Product, it will be withdrawn from sale by the auctioneer. ZA reserves the right to sell any Product at a price below the Reserve; however, in such event ZA will be responsible to Seller for the difference between the hammer price and such Reserve.

Consignor's Initials SP LP



Revised 11/20/2009

7. No Bidding By Seller. Seller shall not, directly or indirectly by or through any of its representatives or agents (other than ZA), enter or cause to be entered a bid on any of Seller's Product being offered for sale.

8. Withdrawal of Products. (a) No Withdrawal by Seller. No Product may be withdrawn by the Seller after the date hereof. If ZA consents to a withdrawal by Seller, the Product may be withdrawn upon payment of 25% of (i) the reserve price, or (ii) if the reserve has not yet been set, the valuation base (as defined in paragraph 14 hereof), in either case plus all out-of-pocket expenses incurred by ZA for packing, shipping or delivery.

(b) Withdrawal by ZA. ZA reserves the right to withdraw any Product at any time before actual sale if in ZA's sole judgment (i) there is doubt as to the attribution, authenticity, quality or potability of the Product, (ii) there is doubt as to the accuracy of Seller's representations or warranties set forth herein in any aspect, (iii) Seller has breached or is about to breach any provision hereof, (iv) there is doubt as to Seller's title to the Product, or (v) for other just cause including, without limitation, cancellation of any auction.
In any such event, ZA will return to Seller the Product withdrawn at no penalty to Seller, but at Seller's sole cost and expense.

9. Unsold Products. (a) Unsold Product. For any Product offered but not sold during the auction, ZA may, in its sole discretion, sell any such Product in a private sale for no less than the reserve amount (except as provided in Section 6), provided that such sale occurs within ten days of the auction's conclusion. Unless otherwise instructed by Seller in writing as set forth below, any Products not sold in auction or pursuant to such private sale shall be retained by ZA and will be placed in a future sale. Any such future sale (i) may or may not be the sale immediately following the one in which the Product did not sell, (ii) may be live or via internet, (iii) shall be subject to a commission rate of 2%, and (iv) shall be at such prices, including reserves, and upon such terms and conditions, as ZA shall determine in its sole and absolute discretion. There will be no service charge with respect to unsold Products, and there will be no charge to Seller for the storage of unsold Product, except as provided below. The proceeds of such subsequent sale shall be remitted to Seller in accordance with the terms of this Agreement.

(b) Reclaim of Unsold Product. If Seller wishes to reclaim unsold Product, (i) ZA must receive written notice from Seller within 30 days of the auction in which the Product was offered for sale, and (ii) any such Product must be reclaimed by Seller and removed from ZA warehouse, at Seller's sole cost and expense, within 60 days from the date of such auction. Thereafter, Product will be transferred to a public wine storage facility, and Seller will be responsible for whatever storage and insurance charges incur. Seller shall not be entitled to reclaim any unsold Product until all commissions, expenses and other amounts owed to ZA have been paid in full.

10. Settlement of Account. ZA will pay Seller the net proceeds of monies received and collected from buyer from the sale of Seller's Products, less any commissions, reimbursable expenses and any other amounts due to ZA from Seller (whether arising out of the sale of the Product or otherwise). ZA will make first such payment to Seller within 60 calendar days after the sale unless, prior to the expiration of such 60 day period, (a) ZA shall have received notice of the Buyer's intention to rescind the sale or any other claim relating to the Product or its sale, or (b) ZA shall have for any reason refunded such proceeds to the Buyer. If necessary, additional payments will occur on the twenty-fifth day of the following month with a minimum of twenty days between payments. All payments for sales conducted in the United States shall be made in US Dollars.

For sales conducted in Hong Kong, Seller may elect to receive payments in either HK Dollars or US Dollars. The currency exchange rate on date Product is sold will be applicable to payments. In Hong Kong sales, for all non Hong Kong residents, there is a 0.5% tax to the Seller on the hammer price of all product sold on Seller behalf. This tax will be deducted from Seller's proceeds and paid to the Hong Kong Government.

11. Non-Payment By Buyer. In the event of nonpayment by the Buyer, ZA may cancel the sale and return the Product to Seller, enforce payment by the Buyer, or take any other actions permitted by law, as ZA shall determine in its sole discretion. In no event shall ZA be liable for any incidental or consequential damages resulting to Seller as a result of any breach or failure by the Buyer.

12. Rescission of Sale. ZA is authorized to accept the return and rescind the sale of any Product at any time if ZA, in its sole judgment, determines that there is a genuine issue as to quality, authenticity or title of the Product, or there exists any other circumstance which, if not remedied, could, in the sole opinion of ZA, result in liability to ZA therefore. In such event, ZA is further authorized to refund or credit to the Buyer the purchase price of such returned Product, and if ZA has already remitted to Seller any proceeds of the rescinded sale, Seller shall, immediately upon notice by ZA, pay to ZA an amount equal to the remitted proceeds; however, in no event shall Seller reimburse ZA more than the Seller received from ZA for the rescinded sale Product.

13. Buyer's Claim. After the sale, if within 30 days following receipt of Product, a Buyer notifies ZA in writing of a claim that the lot is short or ullaged or that any statement of opinion in the catalogue is not well-founded, ZA in its sole and absolute discretion will decide such claim as between the Buyer and Seller. ZA may decide that the sale stand or be rescinded and that the purchase price be refunded in whole or in part. ZA's decision will be final and binding on Buyer and Seller, and no action shall be brought in connection with any claim, except on and in accordance with ZA's decision.



Consignor's Initials

Revised 11/20/2009

14. Insurance. Insurance coverage of all Product will be furnished by ZA as follows: Product will be insured by ZA for any loss or breakage commencing (a) in the case of a pickup by ZA at a location designated by Seller, from the time of such pickup, and (b) in the case of Product received at ZA's premises or a warehouse designated by ZA, from the time of receipt, and in each case such coverage will cease upon the fall of the hammer during the auction. Insurance coverage shall be for an amount not to exceed (i) if the Product has been sold, the hammer price, or (ii) if the Product has not been sold, an amount equal to the mean of our estimates at the time of loss or breakage. Either such amount shall be referred to herein as the "valuation base". ZA's liability to Seller resulting from loss or breakage of any Product shall not exceed the above-mentioned insurance coverage of such Product and will exclude any breakage or loss caused by earthquake, flood, failed cork or any other loss that could normally happen to a bottle of wine. Seller shall, without exception, be charged at a rate of one percent (1%) of the hammer total of the Products being offered at auction in respect of insurance coverage. Any claim will be less the deductible required by the insurance company for the policy in effect at the time. ALL INSURANCE CLAIMS SHALL BE LIMITED TO THE PHYSICAL INVENTORY TAKEN BY ZACHYS, NOTICE OF WHICH WILL BE PROVIDED TO SELLER PROMPTLY UPON COMPLETION.

15. Rights to Images of Products. ZA retains the exclusive right to videotape or photograph the Product for catalogue advertising purposes. ZA retains the exclusive copyright to all catalogue text, illustrations and descriptions of the Products. ZA shall not use Seller's name in its catalogues or advertising, or disclose Seller's name or identity to third parties unless Seller has placed its initials after this paragraph or notifies us either verbally or in writing of Seller's wishes to use Seller's name in ZA's catalogues or advertising or disclose Seller's name or identity to third parties.

16. Tasting & Capsules. ZA may taste sample bottles from the inventory received for consignment in order to assess quality and auction-worthiness of the Product. ZA may select bottles from the consignment inventory to be opened for prospective bidders at pre-auction events, day-of-sale tasting, or other promotional purposes. ZA may cut capsules in order to inspect cork and markings to confirm authenticity.

17. Sales Tax. ZA shall collect from Buyers all sales taxes due, if any, and will timely remit to the appropriate agencies all such sales taxes.

18. SELLER'S REPRESENTATIONS AND WARRANTIES: SELLER REPRESENTS AND WARRANTS THAT (i) SELLER HAS THE RIGHT AND TITLE TO CONSIGN THE PRODUCTS FOR SALE, (ii) THE PRODUCTS ARE, AND UNTIL COMPLETION OF SALE BY ZA, WILL BE, FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES OF OTHERS ("LIENS") OR RESTRICTIONS ON ZA'S RIGHT TO OFFER AND SELL THE PRODUCTS AT AUCTION, (iii) GOOD TITLE WILL PASS TO THE BUYER OF ALL PRODUCTS FREE AND CLEAR OF ANY SUCH LIENS OR RESTRICTIONS. THESE REPRESENTATIONS AND WARRANTIES SHALL SURVIVE THE COMPLETION OF THE TRANSACTIONS CONTEMPLATED HEREBY. SELLER SHALL NOTIFY ZA PROMPTLY IN WRITING OF ANY EVENTS OR CIRCUMSTANCES THAT MAY CAUSE THE FOREGOING TO BE INACCURATE OR BREACHED IN ANY WAY. IF SELLER IS ACTING AS AN AGENT FOR A PRINCIPAL, SELLER AND PRINCIPAL, JOINTLY AND SEVERALLY, ASSUME ALL OF THE OBLIGATIONS UNDER THIS AGREEMENT. SELLER AGREES THAT THE INTENDED BENEFICIARIES OF THIS PROVISION INCLUDE ALL BUYERS OF THE PRODUCTS.

19. Additional Representations and Warranties. (a) By Seller. Seller represents and warrants to ZA that (i) it has full power and authority (if Seller is a legal entity) or legal capacity (if Seller is an individual) to enter into this Agreement and perform its obligations hereunder, (ii) if Seller is a legal entity, this Agreement has been duly authorized and validly executed and, upon execution by ZA, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, and (iii) if Seller is a manufacturer of Product, sale by the Seller of the Product through ZA is for promotional purposes and is not being done to circumvent applicable laws regarding distribution of beverage alcohol.

(b) By ZA. ZA represents and warrants to Seller that (i) it has full power and to enter into this Agreement and perform its obligations hereunder, (ii), this Agreement has been duly authorized and validly executed and, upon execution by Seller, constitutes a legal, valid and binding obligation of ZA, enforceable against ZA in accordance with its terms, and (iii) it is licensed and permitted under the laws of the State of New York to sell the Products in the State of New York.

20. Indemnification. Seller shall indemnify, defend, and hold harmless ZA and its affiliates, and their respective officers, directors, shareholders, members, managers, attorneys, agents, consultants, employees and other representatives (collectively, "Indemnities") from and against any and all claims, liabilities and expenses (including, without limitation, interest, penalties and attorney's fees and amounts paid in investigation, defending or settling any of the foregoing), whether in an action between the parties hereto or between or among any Indemnities and any third party, arising out of or related to: (a) any acts by or omissions of Seller, its agents, employees, or representatives, relating to or affecting the Products, (b) any breach or inaccuracy of any of the representations, warranties, covenants or agreements made by Seller in connection with the transactions contemplated herein, (c) the claims of third parties claiming or challenging title to any Product consigned hereunder, and /or (d) any claims of Buyers, persons claiming for Buyers or for any other person resulting from ZA's offering for sale or selling any Product consigned hereunder, whether or not the Product has been offered, sold, or returned to ZA.

Consignor's Initials ______

21. **Miscellaneous.** (a) This Agreement shall be governed by the internal laws of the State of New York; (b) any disputes arising in connection herewith shall be exclusively resolved in the State of New York before a panel of three arbitrators of the American Arbitration Association (the "AAA") in accordance with its rules on commercial arbitration; (c) the parties hereby irrevocably consent to the exclusive jurisdiction of the State of New York, waive any objection to personal jurisdiction, and waive the right to trial by jury. In furtherance thereof, if Seller is not a United States citizen, Seller hereby appoints _______________ as its Authorized Agent for service of process in the State of New York with respect to any matter arising out of or relating to this Agreement, and represents that such party has agreed to serve as Seller's Authorized Agent in such regard; (d) any notices hereunder shall be in writing and shall be deemed given if delivered either personally, by overnight delivery or sent by certified or registered mail, postage prepaid, to a party at its respective address as set forth above; (e) this Agreement, together with the Schedules hereto, as they may be amended from time to time as provided herein, contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby cancelled. This Agreement may not be amended or terminated orally; (f) ZA has the sole right to amend or replace any of the foregoing Schedules, which, as so amended, shall be deemed incorporated by reference herein and made a part hereof.

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date and year first written above

ZACHYS WINE AUCTIONS, INC.

By: [signature]
Jeff Zacharia
President

Date: 12/10/09

Seller:

By: [signature]
Name: Scott Pasch

Date: 11|23|09

By: [signature]
Name: Lisa Pasch

Date: 11/23/09

Consignor's Initials SP LP



Revised 11/20/2009

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,612

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 5l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 1 | 1964 | Petrus 1964 (1.5L) | 3,000 | 4,500 | | | 3,000 | 4 |
| 2 | 1975 | Lafite Rothschild 1975 (750ML) | 200 | 300 | | | 400 | |
| 1 | 1976 | Lafite Rothschild 1976 (3L) | 750 | 1,100 | | | 750 | 1 |
| 3 | 1976 | Lafite Rothschild 1976 (750ML) | 200 | 300 | | | 600 | |
| 3 | 1978 | Lafite Rothschild 1978 (1.5L) | 400 | 600 | | | 1,200 | 1 |
| 1 | 1978 | Lafite Rothschild 1978 (3L) | 800 | 1,200 | | | 800 | 1 |
| 1 | 1978 | Lafite Rothschild 1978 (6L) | 1,600 | 2,600 | | | 1,600 | 2 |
| 1 | 1982 | Beychevelle 1982 (3L) | 433 | 633 | | | 433 | |
| 3 | 1982 | Canon 1982 (1.5L) | 233 | 333 | | | 700 | 1 |
| 3 | 1982 | La Dominique 1982 (1.5L) | 150 | 217 | | | 450 | |
| 3 | 1982 | Petrus 1982 (750ML) | 2,500 | 3,750 | | | 7,600 | 11 |
| 1 | 1982 | Pichon Longueville Comtesse de Lalande 1982 (3L) | 2,400 | 3,500 | | | 2,400 | 3 |
| 3 | 1982 | Trotanoy 1982 (750ML) | 200 | 300 | | | 600 | |
| 1 | 1983 | Lafite Rothschild 1983 (3L) | 1,000 | 1,667 | | | 1,000 | 1 |
| 3 | 1983 | Palmer 1983 (750ML) | 317 | 542 | | | 950 | 1 |
| 1 | 1985 | Haut Brion 1985 (3L) | 1,100 | 1,600 | | | 1,100 | 1 |
| 1 | 1985 | Lafite Rothschild 1985 (6L) | 2,400 | 3,600 | | | 2,400 | 3 |
| 1 | 1985 | Lynch Bages 1985 (3L) | 700 | 1,000 | | | 700 | 1 |
| 1 | 1985 | Mouton Rothschild 1985 (5L) | 1,500 | 2,200 | | | 1,500 | 2 |
| 3 | 1988 | Lafite Rothschild 1988 (1.5L) | 700 | 1,100 | | | 2,100 | 3 |
| 1 | 1989 | Lafite Rothschild 1989 (3L) | 1,400 | 2,000 | | | 1,400 | 2 |
| 1 | 1989 | Lafite Rothschild 1989 (6L) | 3,000 | 4,400 | | | 3,000 | 4 |
| 3 | 1989 | Petrus 1989 (750ML) | 2,000 | 3,000 | | | 6,000 | 9 |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,612

847 *Btls* 750ml
72 *Btls* 1.5l
30 *Btls* 375ml
17 *Btls* 3l
6 *Btls* 6l
1 *Btls* 5l

973 *Total Bottles*

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 12 | 1990 | Margaux 1990 (375ML) | 250 | 375 | | | 3,000 | 4 |
| 3 | 1990 | Petrus 1990 (750ML) | 2,000 | 3,000 | | | 6,000 | 9 |
| 10 | 1992 | Petrus 1992 (750ML) | 417 | 625 | | | 4,167 | 6 |
| 1 | 1993 | Lafite Rothschild 1993 (6L) | 1,800 | 2,800 | | | 1,800 | 2 |
| 1 | 1994 | L'Evangile 1994 (6L) | 500 | 750 | | | 500 | |
| 6 | 1994 | Petrus 1994 (750ML) | 500 | 750 | | | 3,000 | 4 |
| 18 | 1995 | Ducru Beaucaillou 1995 (375ML) | 50 | 75 | | | 900 | 1 |
| 6 | 1988 | Clos de Vougeot Domaine Leroy 1988 (750ML) | 200 | 300 | | | 1,200 | 1 |
| 3 | 1988 | Clos de Vougeot Domaine Leroy 1988 (750ML) | 200 | 300 | | | 600 | |
| 6 | 1989 | Vosne Romanee Les Beaux Monts Domaine Leroy 1989 (750ml) | 167 | 250 | | | 1,000 | 1 |
| 1 | 1990 | Clos de Vougeot Meo-Camuzet 1990 (1.5L) | 500 | 750 | | | 500 | |
| 6 | 1990 | Gevrey Chambertin Clos St Jacques Michel Esmonin 1990 (750ML) | 71 | 108 | | | 425 | |
| 6 | 1990 | Vosne Romanee Les Beaux Monts Domaine Leroy 1990 (750ml) | 333 | 500 | | | 2,000 | 3 |
| 6 | 1991 | Vosne Romanee Les Beaux Monts Domaine Leroy 1991 (750ml) | 183 | 267 | | | 1,100 | 1 |
| 12 | 1995 | La Tache Domaine de la Romanee Conti 1995 (750ML) | 792 | 1,167 | 9,500 | 14,000 | 9,500 | 14 |
| 6 | 1995 | Nuits St Georges Aux Murgers Meo-Camuzet 1995 (750ml) | 63 | 92 | | | 375 | |
| 12 | 1995 | Nuits St Georges Vignerondes Domaine Leroy 1995 (750ml) | 75 | 108 | 900 | 1,300 | 900 | 1 |
| 3 | 1995 | Vosne Romanee Les Chaumes Meo Camuzet 1995 (750ML) | 63 | 92 | | | 188 | |
| 12 | 1996 | Clos de Vougeot Domaine Leroy 1996 (750ML) | 233 | 333 | 2,800 | 4,000 | 2,800 | 4 |
| 1 | 1996 | Echezeaux Domaine de la Romanee Conti 1996 (1.5L) | 750 | 1,100 | | | 750 | 1 |
| 12 | 1996 | Latricieres Chambertin Dominique Laurent 1996 (750ml) | 100 | 150 | 1,200 | 1,800 | 1,200 | 1 |
| 5 | 1996 | Mazis Chambertin Frederic Esmonin 1996 (750ml) | 50 | 75 | | | 250 | |
| 12 | 1996 | Nuits St Georges Aux Allots Domaine Leroy 1996 (750ML) | 100 | 150 | 1,200 | 1,800 | 1,200 | 1 |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,812

| | | |
|---|---|---|
| 847 | Btls | 750ml |
| 72 | Btls | 1.5l |
| 30 | Btls | 375ml |
| 17 | Btls | 3l |
| 6 | Btls | 6l |
| 1 | Btls | 5l |
| 973 | Total Bottles | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 6 | 1996 | Nuits St Georges Aux Boudots Meo-Camuzet 1996 (750ML) | 75 | 117 | | | 450 | |
| 6 | 1996 | Nuits St Georges Aux Lavieres Domaine Leroy 1996 (750ML) | 100 | 150 | | | 600 | |
| 4 | 1996 | Richebourg A-F Gros 1996 (750ml) | 167 | 250 | | | 667 | 1 |
| 12 | 1996 | Ruchottes Chambertin Frederic Esmonin 1996 (750ML) | 50 | 76 | 600 | 900 | 600 | |
| 1 | 1996 | Vosne Romanee Cros Parantoux Emmanuel Rouget 1996 (1.5L) | 667 | 1,000 | | | 667 | 1 |
| 1 | 1997 | Clos de la Roche Nicolas Potel 1997 (1.5L) | 133 | 200 | | | 133 | |
| 6 | 1999 | Charmes Chambertin Hubert Lignier 1999 (750ML) | 108 | 158 | | | 650 | |
| 1 | 1999 | Clos de la Roche Dujac 1999 (3L) | 1,200 | 1,800 | | | 1,200 | 1 |
| 10 | 1999 | Clos Vougeot Jean Grivot 1999 (750ML) | 58 | 83 | | | 583 | |
| 6 | 1999 | Corton Clos Des Cortons Faiveley 1999 (750ML) | 83 | 125 | | | 500 | |
| 5 | 1999 | Echezeaux Emmanuel Rouget 1999 (750ml) | 117 | 167 | | | 583 | |
| 12 | 1999 | Echezeaux Jean Grivot 1999 (750ML) | 108 | 158 | 1,300 | 1,900 | 1,300 | 1 |
| 5 | 1999 | Gevrey Chambertin Clos St Jacques Armand Rousseau 1999 (750ML) | 200 | 300 | | | 1,000 | 1 |
| 1 | 1999 | La Romanee Bouchard Pere et Fils 1999 (3L) | 1,400 | 2,000 | | | 1,400 | 2 |
| 9 | 1999 | Musigny Vieilles Vignes Comte Georges de Vogue 1999 (750ML) | 333 | 500 | | | 3,000 | 4 |
| 12 | 1999 | Richebourg Anne Gros 1999 (750ML) | 300 | 450 | 3,600 | 5,400 | 3,600 | 5 |
| 3 | 2002 | Grands Echezeaux Domaine de la Romanee Conti 2002 (750ML) | 350 | 550 | | | 1,050 | 1 |
| 1 | 1990 | Batard Montrachet Louis Latour 1990 (750ML) | 83 | 125 | | | 83 | |
| 3 | 1995 | Montrachet Bouchard 1995 (750ML) | 133 | 200 | | | 400 | |
| 9 | 1996 | Puligny Montrachet Les Pucelles Domaine Leflaive 1996 (750ML) | 150 | 250 | | | 1,350 | 2 |
| 6 | 1997 | Chassagne Montrachet Les Ruchottes Domaine Ramonet 1997 (750ML) | 42 | 63 | | | 250 | |
| 4 | 1998 | Meursault Caillerets Coche-Dury 1998 (750ML) | 167 | 250 | | | 667 | 1 |
| 2 | 1998 | Montrachet Domaine Ramonet 1998 (750ML) | 317 | 458 | | | 633 | |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,612

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 6l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 4 | 1999 | Batard Montrachet Domaine Leflaive 1999 (750ML) | 167 | 250 | | | 667 | 1 |
| 2 | 1999 | Bienvenues Batard Montrachet Domaine Ramonet 1999 (1.5L) | 250 | 400 | | | 500 | |
| 5 | 1999 | Bienvenues Batard Montrachet Domaine Ramonet 1999 (750ML) | 110 | 160 | | | 550 | |
| 4 | 1999 | Chassagne Montrachet Les Ruchottes Domaine Ramonet 1999 (1.5L) | 167 | 250 | | | 667 | 1 |
| 10 | 1999 | Corton Charlemagne Louis Jadot 1999 (750ML) | 50 | 75 | | | 500 | |
| 4 | 1999 | Meursault Charmes Comtes Lafon 1999 (750ML) | 125 | 183 | | | 500 | |
| 1 | 1999 | Montrachet Sauzet 1999 (1.5L) | 500 | 750 | | | 500 | |
| 11 | 2000 | Bienvenues Batard Montrachet Domaine Ramonet 2000 (750ML) | 100 | 150 | | | 1,100 | 1 |
| 6 | 2000 | Corton Charlemagne Louis Latour 2000 (750ML) | 42 | 63 | | | 250 | |
| 6 | 2000 | Meursault Genevrieres Comtes Lafon 2000 (750ml) | 100 | 150 | | | 600 | |
| 6 | 1998 | Chateauneuf du Pape Hommage a Jacques Perrin Chateau Beaucastel 1998 (750ML) | 250 | 400 | | | 1,500 | 2 |
| 6 | 1998 | Chateauneuf du Pape Hommage a Jacques Perrin Chateau Beaucastel 1998 (750ML) | 250 | 400 | | | 1,500 | 2 |
| 3 | 1990 | Solaia Antinori 1990 (750ML) | 167 | 250 | | | 500 | |
| 2 | 1995 | Masseto 1995 (1.5L) | 433 | 633 | | | 867 | 1 |
| 6 | 1995 | Masseto 1995 (750ML) | 217 | 317 | | | 1,300 | 1 |
| 3 | 1995 | Ornellaia 1995 (1.5L) | 183 | 267 | | | 550 | |
| 1 | 1995 | Ornellaia 1995 (1.5L) | 183 | 267 | | | 183 | |
| 1 | 1995 | Ornellaia 1995 (3L) | 400 | 600 | | | 400 | |
| 12 | 1995 | Ornellaia 1995 (750ML) | 92 | 133 | 1,100 | 1,600 | 1,100 | 1 |
| 3 | 1995 | Sassicaia 1995 (1.5L) | 200 | 300 | | | 600 | |
| 1 | 1995 | Sassicaia 1995 (3L) | 400 | 600 | | | 400 | |
| 3 | 1995 | Solaia Antinori 1995 (750ML) | 75 | 108 | | | 225 | |
| 1 | 1997 | Ornellaia 1997 (3L) | 600 | 867 | | | 600 | |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,812

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 5l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 1 | 1998 | Sassicaia 1998 (3L) | 533 | 800 | | | 533 | |
| 6 | 1999 | Solaia Antinori 1999 (750ML) | 75 | 117 | | | 450 | |
| 6 | 1990 | Pichon Longueville Baron 1990 (750ML) | 150 | 233 | | | 900 | 1 |
| 1 | 1987 | Opus One 1987 (750ML) | 133 | 200 | | | 133 | |
| 1 | 1990 | Harlan Estate 1990 (750ML) | 350 | 550 | | | 350 | |
| 2 | 1990 | Opus One 1990 (750ML) | 125 | 183 | | | 250 | |
| 6 | 1991 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1991 (750ML) | 150 | 233 | | | 900 | 1 |
| 1 | 1991 | Beringer Vineyards Private Reserve Cabernet Sauvignon 1991 (1.5L) | 100 | 150 | | | 100 | |
| 1 | 1991 | Dominus Estate 1991 (3L) | 700 | 1,000 | | | 700 | 1 |
| 3 | 1991 | Dominus Estate 1991 (750ML) | 133 | 200 | | | 399 | |
| 1 | 1991 | Harlan Estate 1991 (750ML) | 350 | 560 | | | 350 | |
| 2 | 1991 | Opus One 1991 (750ML) | 125 | 183 | | | 250 | |
| 1 | 1991 | Shafer Vineyards Hillside Select Cabernet Sauvignon 1991 (750ML) | 117 | 167 | | | 117 | |
| 14 | 1991 | Stag's Leap Wine Cellars Cask 23 1991 (750ML) | 92 | 133 | 1,100 | 1,600 | 1,283 | 1 |
| 2 | 1992 | Dalla Valle Vineyards Cabernet Sauvignon 1992 (750ML) | 50 | 75 | | | 100 | |
| 1 | 1992 | Dominus Estate 1992 (1.5L) | 200 | 300 | | | 200 | |
| 1 | 1992 | Dominus Estate 1992 (3L) | 400 | 600 | | | 400 | |
| 5 | 1992 | Shafer Vineyards Hillside Select Cabernet Sauvignon 1992 (750ML) | 150 | 217 | | | 750 | 1 |
| 6 | 1992 | Stag's Leap Wine Cellars Cask 23 1992 (750ML) | 117 | 167 | | | 700 | 1 |
| 4 | 1992 | Stag's Leap Wine Cellars SLV Cabernet Sauvignon 1992 (750ML) | 50 | 75 | | | 200 | |
| 6 | 1993 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1993 (1.5L) | 267 | 400 | 1,600 | 2,400 | 1,600 | 2 |
| 1 | 1993 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1993 (750ML) | 217 | 317 | | | 217 | |
| 3 | 1993 | Dalla Valle Vineyards Cabernet Sauvignon 1993 (750ML) | 58 | 83 | | | 175 | |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

| | | | | |
|---|---|---|---|---|
| **Low Estimate:** | 214,832 | 847 | *Btls* | 750ml |
| **High Estimate:** | 320,612 | 72 | *Btls* | 1.5l |
| | | 30 | *Btls* | 375ml |
| | | 17 | *Btls* | 3l |
| | | 6 | *Btls* | 6l |
| | | 1 | *Btls* | 5l |
| | | 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 1 | 1993 | Grace Family Cabernet Sauvignon 1993 (750ML) | 142 | 217 | | | 142 | |
| 1 | 1993 | Harlan Estate 1993 (750ML) | 300 | 450 | | | 300 | |
| 3 | 1993 | Joseph Phelps Vineyards Insignia 1993 (750ML) | 63 | 92 | | | 188 | |
| 3 | 1993 | Shafer Vineyards Hillside Select Cabernet Sauvignon 1993 (750ML) | 108 | 158 | | | 325 | |
| 5 | 1993 | Stag's Leap Wine Cellars Cask 23 1993 (750ML) | 83 | 125 | | | 417 | |
| 1 | 1993 | Williams Selyem Allen Vineyard Pinot Noir 1993 (750ML) | 50 | 75 | | | 50 | |
| 1 | 1993 | Williams Selyem Ferrington Vineyard Pinot Noir 1993 (750ML) | 50 | 75 | | | 50 | |
| 2 | 1993 | Williams Selyem Olivet Lane Pinot Noir 1993 (750ML) | 50 | 75 | | | 100 | |
| 1 | 1993 | Williams Selyem Russian River Valley Pinot Noir 1993 (750ML) | 50 | 75 | | | 50 | |
| 1 | 1993 | Williams Selyem Sonoma Coast Pinot Noir 1993 (750ML) | 40 | 60 | | | 40 | |
| 3 | 1994 | Abreu Vineyards Madrona Ranch Cabernet Sauvignon 1994 (750ml) | 133 | 200 | | | 400 | |
| 12 | 1994 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1994 (750ML) | 200 | 300 | 2,400 | 3,600 | 2,400 | 3 |
| 9 | 1994 | Beaulieu Vineyards Clone #6 Cabernet Sauvignon 1994 (750ML) | 117 | 167 | | | 1,050 | 1 |
| 3 | 1994 | Cain Five Red 1994 (1.5L) | 117 | 167 | | | 350 | |
| 3 | 1994 | Caymus Vineyards Special Selection Cabernet Sauvignon 1994 (750ML) | 100 | 150 | | | 300 | |
| 1 | 1994 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1994 (750ml) | 217 | 333 | | | 217 | |
| 1 | 1994 | Dalla Valle Vineyards Cabernet Sauvignon 1994 (750ML) | 54 | 79 | | | 54 | |
| 3 | 1994 | Dominus Estate 1994 (750ML) | 167 | 250 | | | 500 | |
| 3 | 1994 | Dunn Vineyards Howell Mountain Cabernet Sauvignon 1994 (750ML) | 83 | 125 | | | 250 | |
| 4 | 1994 | Etude Cabernet Sauvignon 1994 (1.5L) | 133 | 200 | | | 533 | |
| 1 | 1994 | Grace Family Cabernet Sauvignon 1994 (750ML) | 233 | 350 | | | 233 | |
| 6 | 1994 | Groth Reserve Cabernet Sauvignon 1994 (750ML) | 100 | 150 | | | 600 | |
| 1 | 1994 | Harlan Estate 1994 (750ML) | 700 | 1,000 | | | 700 | 1 |

zachys

# Auction Proposal

**For**

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,612

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 5l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 3 | 1994 | Joseph Phelps Vineyards Insignia 1994 (750ML) | 133 | 200 | | | 400 | |
| 6 | 1994 | Ridge Vineyards Monte Bello Cabernet Sauvignon 1994 (750ML) | 83 | 125 | | | 500 | |
| 12 | 1994 | Shafer Vineyards Hillside Select Cabernet Sauvignon 1994 (750ML) | 292 | 417 | 3,500 | 5,000 | 3,500 | 5 |
| 6 | 1994 | Shafer Vineyards Hillside Select Cabernet Sauvignon 1994 (750ML) | 292 | 417 | | | 1,750 | 2 |
| 1 | 1994 | Spottswoode Cabernet Sauvignon 1994 (1.5L) | 125 | 183 | | | 125 | |
| 6 | 1994 | Stag's Leap Wine Cellars SLV Cabernet Sauvignon 1994 (750ML) | 50 | 75 | | | 300 | |
| 1 | 1994 | Williams Selyem Sonoma Coast Pinot Noir 1994 (750ML) | 42 | 63 | | | 42 | |
| 3 | 1995 | Abreu Vineyards Madrona Ranch Cabernet Sauvignon 1995 (750ml) | 167 | 250 | | | 500 | |
| 12 | 1995 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1995 (750ML) | 217 | 317 | 2,600 | 3,800 | 2,600 | 3 |
| 3 | 1995 | Caymus Vineyards Special Selection Cabernet Sauvignon 1995 (750ML) | 92 | 133 | | | 275 | |
| 1 | 1995 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1995 (750ml) | 283 | 417 | | | 283 | |
| 3 | 1995 | Dalla Valle Vineyards Cabernet Sauvignon 1995 (750ML) | 67 | 100 | | | 200 | |
| 3 | 1995 | Dominus Estate 1995 (750ML) | 63 | 92 | | | 188 | |
| 1 | 1995 | Far Niente Cabernet Sauvignon 1995 (6L) | 500 | 750 | | | 500 | |
| 2 | 1995 | Harlan Estate 1995 (1.5L) | 1,000 | 1,500 | | | 2,000 | 3 |
| 1 | 1995 | Harlan Estate 1995 (750ML) | 417 | 625 | | | 417 | |
| 1 | 1995 | Opus One 1995 (750ML) | 133 | 200 | | | 133 | |
| 6 | 1995 | Opus One 1995 (750ML) | 133 | 200 | | | 800 | 1 |
| 6 | 1995 | Shafer Vineyards Hillside Select Cabernet Sauvignon 1995 (750ml) | 217 | 317 | | | 1,300 | 1 |
| 6 | 1996 | Abreu Vineyards Madrona Ranch Cabernet Sauvignon 1996 (750ml) | 217 | 317 | | | 1,300 | 1 |
| 12 | 1996 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1996 (750ML) | 125 | 183 | 1,500 | 2,200 | 1,500 | 2 |
| 6 | 1996 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1996 (750ML) | 125 | 183 | | | 750 | 1 |
| 1 | 1996 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1996 (1.5L) | 700 | 1,100 | | | 700 | 1 |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,612

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 5l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 1 | 1996 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1996 (1.5L) | 700 | 1,100 | | | 700 | 1 |
| 1 | 1996 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1996 (3L) | 1,700 | 2,600 | | | 1,700 | 2 |
| 1 | 1996 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1996 (750ml) | 233 | 350 | | | 233 | |
| 3 | 1996 | Dalla Valle Vineyards Cabernet Sauvignon 1996 (750ML) | 63 | 92 | | | 188 | |
| 3 | 1996 | Dominus Estate 1996 (750ML) | 75 | 108 | | | 226 | |
| 9 | 1996 | Dunn Vineyards Howell Mountain Cabernet Sauvignon 1996 (750ML) | 75 | 108 | | | 675 | |
| 1 | 1996 | Harlan Estate 1996 (750ML) | 400 | 600 | | | 400 | |
| 1 | 1996 | Kistler Vineyards Camp Meeting Ridge Pinot Noir 1996 (750ML) | 75 | 100 | | | 75 | |
| 1 | 1996 | Kistler Vineyards Cuvee Catherine Pinot Noir 1996 (750ML) | 142 | 200 | | | 142 | |
| 3 | 1996 | Opus One 1996 (750ML) | 133 | 200 | | | 400 | |
| 6 | 1996 | Spottswoode Cabernet Sauvignon 1996 (750ML) | 42 | 63 | | | 250 | |
| 1 | 1996 | Williams Selyem Allen Vineyard Pinot Noir 1996 (750ML) | 63 | 92 | | | 63 | |
| 2 | 1996 | Williams Selyem Hirsch Vineyard Pinot Noir 1996 (750ML) | 50 | 75 | | | 100 | |
| 1 | 1996 | Williams Selyem Sonoma Coast Pinot Noir 1996 (750ML) | 36 | 54 | | | 38 | |
| 10 | 1997 | Abreu Vineyards Madrona Ranch Cabernet Sauvignon 1997 (750ml) | 400 | 625 | | | 4,000 | 6 |
| 1 | 1997 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1997 (750ml) | 400 | 600 | | | 400 | |
| 6 | 1997 | David Arthur Elevation 1147 Cabernet Sauvignon 1997 (750ML) | 150 | 217 | | | 900 | 1 |
| 3 | 1997 | Gemstone Napa Red 1997 (750ML) | 75 | 108 | | | 225 | |
| 3 | 1997 | Gemstone Napa Red 1997 (750ML) | 75 | 108 | | | 225 | |
| 1 | 1997 | Harlan Estate 1997 (750ML) | 700 | 1,000 | | | 700 | 1 |
| 1 | 1997 | Kistler Vineyards Camp Meeting Ridge Pinot Noir 1997 (750ML) | 83 | 125 | | | 83 | |
| 1 | 1997 | Kistler Vineyards Kistler Vineyard Cuvee Catherine Pinot Noir 1997 (750ML) | 133 | 200 | | | 133 | |
| 5 | 1997 | Kistler Vineyards Kistler Vineyard Pinot Noir 1997 (750ML) | 100 | 150 | | | 500 | |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,612

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 9l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 3 | 1997 | Kistler Vineyards Sonoma Coast Pinot Noir 1997 (750ML) | 67 | 100 | | | 200 | |
| 3 | 1997 | Opus One 1997 (750ML) | 150 | 233 | | | 450 | |
| 1 | 1997 | Williams Selyem Allen Vineyard Pinot Noir 1997 (750ML) | 42 | 63 | | | 42 | |
| 1 | 1997 | Williams Selyem Coastlands Vineyard Pinot Noir 1997 (750ML) | 42 | 63 | | | 42 | |
| 4 | 1997 | Williams Selyem Hirsch Vineyard Pinot Noir 1997 (750ML) | 42 | 63 | | | 167 | |
| 2 | 1997 | Williams Selyem Riverblock Vineyard Pinot Noir 1997 (750ML) | 42 | 63 | | | 83 | |
| 1 | 1998 | Colgin Herb Lamb Vineyard Cabernet Sauvignon 1998 (750ml) | 100 | 150 | | | 100 | |
| 1 | 1998 | Grace Family Cabernet Sauvignon 1998 (750ML) | 100 | 150 | | | 100 | |
| 1 | 1998 | Harlan Estate 1998 (750ML) | 250 | 400 | | | 250 | |
| 1 | 1998 | Williams Selyem Mendocino Pinot Noir 1998 (750ML) | 38 | 54 | | | 38 | |
| 2 | 1998 | Williams Selyem Sonoma Coast Pinot Noir 1998 (750ML) | 38 | 54 | | | 76 | |
| 6 | 1999 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1999 (750ML) | 150 | 217 | | | 900 | 1 |
| 6 | 1999 | Araujo Estate Eisele Vineyard Cabernet Sauvignon 1999 (750ML) | 150 | 217 | | | 900 | 1 |
| 1 | 1999 | Bond Melbury Napa Valley Red 1999 (750ML) | 100 | 150 | | | 100 | |
| 1 | 1999 | Bond Vecina Napa Valley Red 1999 (750ML) | 100 | 150 | | | 100 | |
| 2 | 2000 | Harlan Estate 2000 (1.5L) | 450 | 700 | | | 900 | 1 |
| 2 | 2002 | Harlan Estate 2002 (1.5L) | 1,100 | 1,600 | | | 2,200 | 3 |
| 6 | 2002 | Harlan Estate 2002 (750ML) | 550 | 800 | | | 3,300 | 4 |
| 11 | 2002 | Kistler Vineyards Sonoma Coast Pinot Noir 2002 (750ML) | 50 | 75 | | | 550 | |
| 3 | 2003 | Bond Estate Matriarch 2003 (750ML) | 46 | 67 | | | 137 | |
| 3 | 2003 | Bond Estate Matriarch 2003 (750ML) | 46 | 67 | | | 137 | |
| 1 | 2003 | Kistler Vineyards Cuvee Catherine Pinot Noir 2003 (750ML) | 117 | 167 | | | 117 | |
| 1 | 2003 | Kistler Vineyards Cuvee Elizabeth Pinot Noir 2003 (750ML) | 133 | 200 | | | 133 | |

zachys

# Auction Proposal
For
*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

| | | | | |
|---|---|---|---|---|
| **Low Estimate:** | 214,832 | 847 | *Btls* | 750ml |
| **High Estimate:** | 320,612 | 72 | *Btls* | 1.5l |
| | | 30 | *Btls* | 375ml |
| | | 17 | *Btls* | 3l |
| | | 6 | *Btls* | 6l |
| | | 1 | *Btls* | 5l |
| | | 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 1 | 2003 | Kistler Vineyards Kistler Vineyard Pinot Noir 2003 (750ML) | 79 | 117 | | | 79 | |
| 7 | 2003 | Kistler Vineyards Kistler Vineyard Pinot Noir 2003 (750ML) | 79 | 117 | | | 554 | |
| 6 | 2003 | Screaming Eagle Cabernet Sauvignon 2003 (750ML) | 900 | 1,400 | | | 5,400 | 8 |
| 6 | 2004 | Bond Estate Matriarch 2004 (750ML) | 58 | 83 | | | 350 | |
| 1 | 2004 | Bond Melbury Napa Valley Red 2004 (1.5L) | 200 | 300 | | | 200 | |
| 3 | 2004 | Bond Melbury Napa Valley Red 2004 (750ML) | 100 | 150 | | | 300 | |
| 1 | 2004 | Bond Pluribus Napa Valley Red 2004 (1.5L) | 200 | 300 | | | 200 | |
| 3 | 2004 | Bond Pluribus Napa Valley Red 2004 (750ML) | 100 | 150 | | | 300 | |
| 1 | 2004 | Bond St. Eden Napa Valley Red 2004 (1.5L) | 200 | 300 | | | 200 | |
| 3 | 2004 | Bond St. Eden Napa Valley Red 2004 (750ML) | 100 | 150 | | | 300 | |
| 1 | 2004 | Bond Vecina Napa Valley Red 2004 (1.5L) | 200 | 300 | | | 200 | |
| 3 | 2004 | Bond Vecina Napa Valley Red 2004 (750ML) | 100 | 150 | | | 300 | |
| 3 | 2004 | Harlan Estate 2004 (1.5L) | 600 | 900 | | | 1,800 | 2 |
| 6 | 2004 | Harlan Estate 2004 (750ML) | 300 | 450 | | | 1,800 | 2 |
| 3 | 2004 | Screaming Eagle Cabernet Sauvignon 2004 (750ML) | 1,000 | 1,500 | | | 3,000 | 4 |
| 6 | 2005 | Bond Estate Matriarch 2005 (750ML) | 58 | 83 | | | 350 | |
| 1 | 2005 | Bond Melbury Napa Valley Red 2005 (1.5L) | 200 | 300 | | | 200 | |
| 3 | 2005 | Bond Melbury Napa Valley Red 2005 (750ML) | 100 | 150 | | | 300 | |
| 1 | 2005 | Bond Pluribus Napa Valley Red 2005 (1.5L) | 200 | 300 | | | 200 | |
| 3 | 2005 | Bond Pluribus Napa Valley Red 2005 (750ML) | 100 | 150 | | | 300 | |
| 1 | 2005 | Bond St. Eden Napa Valley Red 2005 (1.5L) | 200 | 300 | | | 200 | |
| 3 | 2005 | Bond St. Eden Napa Valley Red 2005 (750ML) | 100 | 150 | | | 300 | |
| 1 | 2005 | Bond Vecina Napa Valley Red 2005 (1.5L) | 200 | 300 | | | 200 | |

zachys

# Auction Proposal

For

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,612

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 5l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 3 | 2005 | Bond Vecina Napa Valley Red 2005 (750ML) | 100 | 150 | | | 300 | |
| 3 | 2005 | Harlan Estate 2005 (1.5L) | 750 | 1,100 | | | 2,250 | 3 |
| 6 | 2005 | Harlan Estate 2005 (750ML) | 350 | 500 | | | 2,100 | 3 |
| 6 | 2005 | Harlan Estate The Maiden 2005 (750ML) | 100 | 150 | | | 600 | |
| 3 | 2006 | Screaming Eagle Cabernet Sauvignon 2006 (750ML) | 800 | 1,200 | | | 2,400 | 3 |
| 1 | 1995 | Marcassin E Block Hudson Vineyard Chardonnay 1995 (750ml) | 233 | 333 | | | 233 | |
| 3 | 1995 | Marcassin Lorenzo Vineyard Chardonnay 1995 (750ml) | 150 | 217 | | | 450 | |
| 1 | 1996 | Marcassin E Block Hudson Vineyard Chardonnay 1996 (750ml) | 150 | 217 | | | 150 | |
| 2 | 1997 | Marcassin Marcassin Vineyard Chardonnay 1997 (750ML) | 233 | 350 | | | 467 | |
| 3 | 2000 | Kistler Vineyards Cuvee Cathleen Chardonnay 2000 (750ML) | 83 | 125 | | | 250 | |
| 1 | 2000 | Kistler Vineyards Hyde Vineyard Chardonnay 2000 (750ML) | 50 | 75 | | | 50 | |
| 1 | 2000 | Peter Michael Mon Plaisir Chardonnay 2000 (1.5L) | 125 | 183 | | | 125 | |
| 1 | 2001 | Kistler Vineyards Hirsch Vineyard Chardonnay 2001 (750ML) | 67 | 100 | | | 67 | |
| 1 | 2001 | Kistler Vineyards Hudson Vineyard Chardonnay 2001 (750ML) | 46 | 67 | | | 46 | |
| 1 | 2001 | Kistler Vineyards Hyde Vineyard Chardonnay 2001 (750ML) | 50 | 75 | | | 50 | |
| 1 | 2001 | Kistler Vineyards Kistler Vineyard Chardonnay 2001 (750ML) | 50 | 75 | | | 50 | |
| 3 | 2002 | Kistler Vineyards Dutton Ranch Chardonnay 2002 (750ML) | 42 | 63 | | | 125 | |
| 1 | 2002 | Kistler Vineyards McCrea Vineyard Chardonnay 2002 (750ML) | 46 | 67 | | | 46 | |
| 9 | 2002 | Kistler Vineyards McCrea Vineyard Chardonnay 2002 (750ML) | 46 | 67 | | | 412 | |
| 4 | 2003 | Kistler Vineyards Cuvee Cathleen Chardonnay 2003 (750ML) | 83 | 125 | | | 333 | |
| 2 | 2003 | Kistler Vineyards Kistler Vineyard Chardonnay 2003 (750ML) | 58 | 83 | | | 117 | |
| 1 | 2003 | Kistler Vineyards Vine Hill Vineyard Chardonnay 2003 (750ML) | 75 | 100 | | | 75 | |
| 1 | 2004 | Kistler Vineyards Durell Vineyard Chardonnay 2004 (750ML) | 42 | 63 | | | 42 | |

zachys

# Auction Proposal

**For**

*Scott Pasch*

39 Westmoreland Ave.
White Plains, NY 10601
Tel: (914)448-3026
Fax: (914)206-4544
Email: Auction@zachys.com

V124457
Scott Pasch
Civic Development Group
425 Raritan Ctr Pky
Edison, NJ 088377809

**Consignment:** 5773
**Prepared By:** jp
**Print Date:** 11/30/2009

**Low Estimate:** 214,832
**High Estimate:** 320,812

| | | |
|---|---|---|
| 847 | *Btls* | 750ml |
| 72 | *Btls* | 1.5l |
| 30 | *Btls* | 375ml |
| 17 | *Btls* | 3l |
| 6 | *Btls* | 6l |
| 1 | *Btls* | 5l |
| 973 | *Total Bottles* | |

| Qty | Vint | Description | Btl. Low | Btl. High | Cs Low | Cs High | Ext Low | Ext Hig |
|---|---|---|---|---|---|---|---|---|
| 3 | 2004 | Kistler Vineyards Durell Vineyard Chardonnay 2004 (750ML) | 42 | 63 | | | 125 | |
| 1 | 2004 | Kistler Vineyards Dutton Ranch Chardonnay 2004 (750ML) | 50 | 75 | | | 50 | |
| 11 | 2004 | Kistler Vineyards Dutton Ranch Chardonnay 2004 (750ML) | 50 | 75 | | | 550 | |
| 3 | 2004 | Kistler Vineyards Dutton Ranch Chardonnay 2004 (750ML) | 50 | 75 | | | 150 | |
| 1 | 2004 | Kistler Vineyards Kistler Vineyard Chardonnay 2004 (750ML) | 63 | 92 | | | 63 | |
| 6 | 2004 | Kistler Vineyards Kistler Vineyard Chardonnay 2004 (750ML) | 63 | 92 | | | 375 | |
| 5 | 2004 | Kistler Vineyards McCrea Vineyard Chardonnay 2004 (750ML) | 46 | 67 | | | 229 | |
| 12 | 2004 | Kistler Vineyards McCrea Vineyard Chardonnay 2004 (750ML) | 46 | 67 | 550 | 800 | 550 | |
| 4 | 2004 | Kistler Vineyards Vine Hill Vineyard Chardonnay 2004 (750ML) | 42 | 63 | | | 167 | |

**Pasch Schedule B**
**Exhibit 2**

**Item 20. Personal Property**

List all personal property, by category, whether held for personal use or for investment, including but not limited to, furniture and household goods of value, computer equipment, electronics, coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
| Artwork | Scott & Lisa Pasch | Warren NJ Residence | $ 2,500,000 | $ ~1,400,000 |
| Artwork (continued from above) | Scott & Lisa Pasch | Consigned in London and FL | $ included | $ included |
| Wine | Scott & Lisa Pasch | Consigned to Zachy's | $ Unknown | $ ~250,000 |
| Guitars | Scott & Lisa Pasch | Warren NJ Residence | $ Unknown | $ ~700,000 |
| Jewelry | Scott & Lisa Pasch | Warren NJ Residence | $ 700,000 | $ ~300,000 |
| See Exhibits D-K for lists of | property and | valuation support | $ | $ |

**Item 21. Cars, Trucks, Motorcycles, Boats, Airplanes, and Other Vehicles**

List all cars, trucks, motorcycles, boats, airplanes, and other vehicles owned or operated by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

▸Vehicle Type Car Make Mercedes Benz Model CLK320 Year 2004

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200916100004182

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ ~50,000 Current Value $ ~20,000 Retail Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A

▸Vehicle Type Car Make Mercedes Benz Model G500 AWD Year 2002

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200933600009523

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ 77,000 Current Value $ ~25,000 Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A



Initials SP

## ATTACHMENTS

**Item 33.** **Documents Attached to this Financial Statement**

List all documents that are being submitted with this financial statement.

| Item No. Document Relates To | Description of Document |
|---|---|
| 9 | Supplement Pending Lawsuits (Exhibit A) |
| 12,13,14,19,29 | Financial Information (Cash, Securities, etc.) (Exhibit B) |
| 18 | Supplement Life Insurance (Exhibit C) |
| 20 | Artwork list and valuations (Exhibits D-F) |
| 20 | Wine list and valuations (Exhibit G) |
| 20 | Guitar list and valuations (Exhibits H-J) |
| 20 | Jewelry list (Exhibit K) |
| 21 | Supplement Car Information (Exhibit L) |
| 22 | Home valuations (Exhibits M-N) |
| 27 | 2006-2008 Personal Income Tax Returns |

I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court. I have used my best efforts to obtain the information requested in this statement. The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge. I have provided all requested documents in my custody, possession, or control. I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines). I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

2/4/10
(Date)

Signature [signature]



Initials [initials]

# EXHIBIT H

SCOTT AND LISA PASCH
7 KENSINGTON COURT
WARREN NJ, 07059

SUPPLEMENTAL PROPERTY SCHEDULE - GUITARS

| MAKE | YEAR | MODEL | SERIAL # |
|---|---|---|---|
| FENDER | 1965 | STRATOCASTER SUNBURST | L51810 |
| FENDER | 1957 | STRATOCASTER SUNBURST | 025159 |
| FENDER | 1965 | STRATOCASTER CANDY APPLE RED | 125825 |
| GIBSON | 1961 | LES PAUL CUSTOM | 1-0864 |
| GIBSON | 1955 | J-200 ACOUSTIC | A31001 |
| FENDER | 1962 | STRATOCASTER SUNBURST | L58059 |
| GIBSON | 1962 | LES PAUL EBONY BLOCK SG | 99046 |
| FENDER | 1955 | STRATOCASTER SUNBURST | 09577 |
| FENDER | 1957 | TELECASTER WHITE GUARD | 024413 |
| FENDER | 1959 | TELECASTER WHITE GUARD | 35645 |
| FENDER | 1968 | TELECASTER CUSTOM | 236202 |
| FENDER | 1958 | JAZZ MASTER | 39029 |
| FENDER | 1966 | TELECASTER CANDY APPLE RED | 158932 |
| FENDER | 1968 | TELECASTER CUSTOM | 242823 |
| FEDNER | 1957 | STRATOCASTER SUNBURST | 29092 |
| FENDER | 1964 | STRATOCASTER OLYMPIC WHITE | L46579 |
| GIBSON | 1959 | LES PAUL BLACK- 3 PICKUP | 91786 |
| GIBSON | 1957 | LES PAUL BLACK- 3 PICKUP | 78531 |
| FENDER | 1958 | STRATOCASTER MAPLE NECK | 022631 |
| FENDER | 1958 | JAZZ BASS GOLD PICK GUARD | 026342 |
| FENDER | 1957 | ESQUIRE WHITE GUARD | 23738 |
| FENDER | 1956 | STRATOCASTER SUNBURST | 16123 |
| FENDER | 1964 | STRATOCASTER OLYMPIC WHITE | L69757 |
| FENDER | 1965 | STRATOCASTER BLONDE | L75897 |
| FENDER | 1965 | STRATOCASTER CANDY APPLE RED | L85317 |
| FENDER | 1958 | TELECASTER BLONDE | 33920 |
| FENDER | 1963 | TELECASTER CUSTOM BOUND | L02146 |
| FENDER | 1965 | TELECASTER BLACK | 202695 |
| FENDER | 1968 | TELECASTER PAISLEY RED | 218404 |
| FENDER | 1966 | TELECASTER WHITE GUARD | 173256 |

# EXHIBIT I

Hoboken Vintage and Classic Guitars
164 First Street
Hoboken, New Jersey 07030
201-222-8977

Mr. Scott Pasch

Scott:
Here are the figures that we came up with to sell your guitar on a consignment basis. We will work on a 10% consignment fee after sale for you. This is a discount rate. Prices shown will be our selling price.

Thank you,

Richard Rybinski

Hoboken Vintage and Classic Guitars

| | |
|---|---|
| 1965 Fender Stratocaster Sunburst | $13000.00 |
| 1957 Fender Stratocaster Sunburst | $28000.00 |
| 1965 Fender Stratocaster Candy Apple Red | $23000.00 |
| 1961 Gibson les Paul Custom | $65000.00 |
| 1955 Gibson J-200 | $10000.00 |
| 1962 Fender Stratocaster | $20000.00 |
| 1962 Gibson SG LP Std. Ebony Block | $20000.00 |
| 1955 Fender Stratocaster Sunburst | $30000.00 |
| 1957 Fender Telecaster | $23000.00 |
| 1959 fender Telecaster | $24000.00 |
| 1968 fender Telecaster Custom | $13000.00 |
| 1957 Fender Stratocaster Sunburst | $28000.00 |
| 1964 Fender Stratocaster Olympic white | $24000.00 |
| 1959 Gibson Les Paul Custom | $70000.00 |
| 1957 Gibson Les Paul Custom | $70000.00 |
| 1958 Fender Stratocaster | $25000.00 |
| 1958 Fender Precision Bass | $18000.00 |
| 1957 Fender Esquire | $16000.00 |
| 1956 Fender Stratocaster | $35000.00 |
| 1964 Fender Stratocaster White | $24000.00 |
| 1965 Fender Stratocaster Blonde | $25000.00 |

| | |
|---|---|
| 1965 Fender Stratocaster Candy apple Red | $22000.00 |
| 1958 Fender Telecaster Blonde | $24000.00 |
| 1963 Fender Custom Telecaster bound | $26500.00 |
| 1965 Fender Telecaster Black | $13000.00 |
| 1968 Fender Telecaster paisley | $18000.00 |
| 1966 Fender Telecaster | $12500.00 |
| 1968 Fender Custom Telecaster Bound | $13500.00 |
| 1966 Fender Telecaster Candy apple Red | $12500.00 |
| 1958 fender Jazzmaster Anodized Guard | $10000.00 |

These are full retail prices and this does not constitute an offer to buy, rather, this is an offer to consign these instruments at 10% of the purchase price, in addition to fees incurred.

These are reasonable market prices as the prices of these have dropped significantly within the last 2 years.

Richard Rybinski

[signature]

Hoboken Vintage and Classic Guitars
201-222-8977

Total: $756,000

Pasch Schedule B
Exhibit 3

**Item 20.** **Personal Property**

List all personal property, by category, whether held for personal use or for investment, including but not limited to, furniture and household goods of value, computer equipment, electronics, coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
| Artwork | Scott & Lisa Pasch | Warren NJ Residence | $ 2,500,000 | $ ~1,400,000 |
| Artwork (continued from above) | Scott & Lisa Pasch | Consigned in London and FL | $ included | $ included |
| Wine | Scott & Lisa Pasch | Consigned to Zachy's | $ Unknown | $ ~250,000 |
| Guitars | Scott & Lisa Pasch | Warren NJ Residence | $ Unknown | $ ~700,000 |
| Jewelry | Scott & Lisa Pasch | Warren NJ Residence | $ 700,000 | $ ~300,000 |
| See Exhibits D-K for lists of | property and | valuation support | $ | $ |

**Item 21.** **Cars, Trucks, Motorcycles, Boats, Airplanes, and Other Vehicles**

List all cars, trucks, motorcycles, boats, airplanes, and other vehicles owned or operated by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

▸Vehicle Type Car Make Mercedes Benz Model CLK320 Year 2004

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200916100004182

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ ~50,000 Current Value $ ~20,000 Retail Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A

▸Vehicle Type Car Make Mercedes Benz Model G500 AWD Year 2002

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200933600009523

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ 77,000 Current Value $ ~25,000 Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A



Initials [handwritten initials]

## ATTACHMENTS

**Item 33.** **Documents Attached to this Financial Statement**

List all documents that are being submitted with this financial statement.

| Item No. Document Relates To | Description of Document |
|---|---|
| 9 | Supplement Pending Lawsuits (Exhibit A) |
| 12,13,14,19,29 | Financial Information (Cash, Securities, etc.) (Exhibit B) |
| 18 | Supplement Life Insurance (Exhibit C) |
| 20 | Artwork list and valuations (Exhibits D-F) |
| 20 | Wine list and valuations (Exhibit G) |
| 20 | Guitar list and valuations (Exhibits H-J) |
| 20 | Jewelry list (Exhibit K) |
| 21 | Supplement Car Information (Exhibit L) |
| 22 | Home valuations (Exhibits M-N) |
| 27 | 2006-2008 Personal Income Tax Returns |

I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court. I have used my best efforts to obtain the information requested in this statement. The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge. I have provided all requested documents in my custody, possession, or control. I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines). I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

2/4/10
(Date)

Signature [signature]



Initials [initials]

# EXHIBIT K

**Scott and Lisa Pasch**
**7 Kensington Court**
**Warren, NJ 07059**

**Supplemental Property Schedule**

**JEWELRY**

1. TIFFANY CLASSIC DIAMOND OR GOLD NECKLACE X PATTERN
2. PATEK PHILLIPE WATCH YELLOW GOLD SERIAL 4910/10A-010 DIAMONDS 0.45CTS BRACELET ACIER
3. PATEK PHILLIPE WATCH SERIAL # 3940 WHITE GOLD, RUBIES/WATCH JEWELS 24 CADRAN/DIAL, FOND ARGENT, HUERES RELIES
4. ONE LADIES DIAMOND ENGAGEMENT RING CUSTOM RING SIZE 5 14KT YELLOW GOLD CAST MOUNTING CONTAINS ONE CENTER PEAR BRILLIANT CUT WEIGHT 1CT
5. LADIES ROUND BRILLIANT CUT DIAMOND RING WEIGHT 5.44CTS. 14KT Y SOLITAIRE MOUNTING
6. A TIFFANY CO. PLATINUM AND DIAMOND THREE STONE RING EACH DIAMOND WEIGHING THE FOLLOWING: 1.01CT, 1CT, 1.02CT, E COLOR, VS1 CLARITY
7. ONE TIFFANY & CO. PLATINUM DIAMOND PENDANT, SET WITH ONE ROUND BRILLIANT CUT DIAMOND WEIGHING 2.62CTS, I COLOR, VS1 CLARITY
8. ONE TIFFANY 18 KARAT YELLOW GOLD AND PLATINUM YELLOW SAPHIRE AND DIAMOND RING, SETWITH ONE EMERALD SAPPHIRE WEIGHING 9.97CARATS
9. F.P. JOURNE RESONANCE 40MM ROSE GOLD CASE 4N MOVEMENT TWO TIME ZONE WHITE GOLD DIAL
10. H46565 ROGER DUBUIS ROSE GOLD CASE BLACK/GOLD SPPLIED ROMAN NUMERALS
11. 570bb129v6 BREGUET "LE REVEIL DU TSAR" ALARM 2ND TIME ZONE ON 24 HOUR SUBSIDIARY AT 9 O'CLOCK, WHITE GOLD CASE ON BLACK ALLIGATOR STRAP SN#7601
12. 3710BR929ZE BREGUET TYPE XX1 CHRONOGRAPH 18K ROSE GOLD CASE ON BROWN ALLIGATOR STRAP SN#7601
13. 3755PRLE9V6 BREGUET BTS SKELETON TOURBILLON, PLATINUM ON ALLIGATOR BANK
14. YELLOW DIAMOND HEART PENDANT – GIA CERTIFIED 1.51 CT FANCY INTENSE YELLOW, S11CLARITY, HEART SET IN 18K GOLD REPOT#14284181

Pasch Schedule B
Exhibit 4

**Item 20.** **Personal Property**

List all personal property, by category, whether held for personal use or for investment, including but not limited to, furniture and household goods of value, computer equipment, electronics, coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
| Artwork | Scott & Lisa Pasch | Warren NJ Residence | $ 2,500,000 | $ ~1,400,000 |
| Artwork (continued from above) | Scott & Lisa Pasch | Consigned in London and FL | $ included | $ included |
| Wine | Scott & Lisa Pasch | Consigned to Zachy's | $ Unknown | $ ~250,000 |
| Guitars | Scott & Lisa Pasch | Warren NJ Residence | $ Unknown | $ ~700,000 |
| Jewelry | Scott & Lisa Pasch | Warren NJ Residence | $ 700,000 | $ ~300,000 |
| See Exhibits D-K for lists of | property and | valuation support | $ | $ |

**Item 21.** **Cars, Trucks, Motorcycles, Boats, Airplanes, and Other Vehicles**

List all cars, trucks, motorcycles, boats, airplanes, and other vehicles owned or operated by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

▸Vehicle Type Car Make Mercedes Benz Model CLK320 Year 2004

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200916100004182

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ ~50,000 Current Value $ ~20,000 Retail Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A

▸Vehicle Type Car Make Mercedes Benz Model G500 AWD Year 2002

Registered Owner's Name Scott Pasch Registration State & No. NJ WW200933600009523

Address of Vehicle's Location Warren NJ Residence

Purchase Price $ 77,000 Current Value $ ~25,000 Account/Loan No. None

Lender's Name and Address None

Original Loan Amount $ N/A Current Loan Balance $ N/A Monthly Payment $ N/A



Initials [handwritten initials]

## ATTACHMENTS

**Item 33.** **Documents Attached to this Financial Statement**

List all documents that are being submitted with this financial statement.

| Item No. Document Relates To | Description of Document |
|---|---|
| 9 | Supplement Pending Lawsuits (Exhibit A) |
| 12,13,14,19,29 | Financial Information (Cash, Securities, etc.) (Exhibit B) |
| 18 | Supplement Life Insurance (Exhibit C) |
| 20 | Artwork list and valuations (Exhibits D-F) |
| 20 | Wine list and valuations (Exhibit G) |
| 20 | Guitar list and valuations (Exhibits H-J) |
| 20 | Jewelry list (Exhibit K) |
| 21 | Supplement Car Information (Exhibit L) |
| 22 | Home valuations (Exhibits M-N) |
| 27 | 2006-2008 Personal Income Tax Returns |

I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court. I have used my best efforts to obtain the information requested in this statement. The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge. I have provided all requested documents in my custody, possession, or control. I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines). I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

2/4/10
(Date)

Signature



Initials

# EXHIBIT D

CHRISTIE, MANSON & WOODS LTD.
8 King Street, St James's,
London SW1Y 6QT
Telephone: 020 7839 9060
Fax: 020 7839 1611
Registered in England No. 1128160
VAT Reg. No. GB 503 3060 06

# CHRISTIE'S

SCHEDULE OF PROPERTY
Client

Mrs Lisa Pesch
7 Kensington Court
Warren NJ 07059
U S A

Client: 1815440
Tel: 1 908 604 2391
VAT Status: OUTSIDE EEC

Client Status: OWNER

Stock No: X6746
Commission: Private
Christie's Loss/Damage Liability

| REF NOS. Line | Mss | Qty | OBJECT DETAILS Description | Dept/Inits | SALE RECOMMENDATIONS Reserve | Estimate | Proposed Date | Owner's (Shipment) Estimate | Received | Marketing Fee & Liability for loss/damage whilst in transit (TL) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | 1 | Vincent Van Gogh<br>*The Iron Mill in the Hague*<br>gouache, pen and ink on paper | MOD<br>GRB | 450,000<br>GB pounds sterling<br>Suggested | 450,000/<br>550,000<br>GB pounds sterling<br>Agreed | 02FEB10 | | Not Received | |

**Illustration:** Lots are illustrated at Christie's reasonable discretion. **Provisional Estimates:** All require confirmation by Christie's once the property has been received and examined at the sale site. Until this examination has taken place, your estimates will be shown as provisional and you should be aware that following examination, a new Schedule may be sent to you which could reflect different descriptions and estimates from those shown here. **Picture Frames:** Many picture frames are fragile and easily damaged. Christie's will use reasonable skill and care in handling frames in such a manner as to minimize the risk of damage arising, but cannot accept liability where damage occurs either because of the innate fragility of the frame or as a result of circumstances beyond Christie's reasonable control. **Payment Method and Currency:** Will be by cheque in the sale site currency to you, the Consignor, at your address (as stated on your Consignment Agreement) unless you specify otherwise by completing and returning the Payment Instruction Form to be received at Christie's by no later than 10 days before the relevant auction.

Special Instruction:
2% commission all in.
Christie's to absorb all
other sale related
charges.

Continued.../

Mrs Lisa Pasch Client: 1815440 Stock No: X9746 Page 2 Continuation SCHEDULE OF PROPERTY

No alternate payee details exist for this client

Signature: The Property listed above has been consigned to Christie's under the terms and conditions of the Consignment Agreement dated 13NOV09 which I have read and agree to be bound by.

Consignor ...Lisa Pasch... Date ...12/8/09... Christie's .................... Date ....................

Print name ...Lisa Pasch... Print name ....................

X9746/0001 Date Printed: 13NOV09 at: 12:03 by CKS.HOD.LMS Issue 12 (May 06) Form Ref S/CKS_8

*Client*

| | |
|---|---|
| Date: | 13-NOV-09 |
| Client Number: | 1815440 |
| Printed From SN: | XS746 |
| Printed By: | CKSMOD.LMS |

# CHRISTIE'S

CONSIGNMENT AGREEMENT BETWEEN

| CONSIGNOR | AND | CHRISTIE, MANSON & WOODS LTD ("CHRISTIE'S") |
|---|---|---|
| Mrs Lisa Pesch<br>7 Kensington Court<br>Warren NJ 07059<br>USA | | 8 KING STREET<br>ST JAMES'S<br>LONDON<br>SW1Y 6QT<br>Tel: (020) 7839 9060<br>Fax: (020) 7839 1611 |

| | | |
|---|---|---|
| VAT status: | OUTSIDE EC | |
| VAT number: | | VAT No. GB 583 3080 06 |
| Commission type: | Private | |
| Telephone number: | 1 908 604 2391 | FOR CHRISTIE'S USE ONLY<br>MCC: ___ |
| For & on behalf of: | | |

It is important that you read and understand the terms and conditions contained in this agreement before you sign. If there is any term that you do not understand or do not wish to agree to, please discuss it with an appropriate member of Christie's staff before signing. Only sign if you wish to be bound by the terms and conditions. Thank you for choosing to sell your property through Christie's. This document sets out the terms and conditions of our agreement with you. You should read carefully both this document and the Conditions of Sale set out at the back of our catalogues since they create legal rights and obligations.

1. **YOUR INSTRUCTIONS TO SELL**
We shall offer for sale, as your exclusive agent, the property listed in the attached Property Description and referred to in this document as "the Lots". The Lots will be sold at public auction unless we agree otherwise. Since we shall be selling as your agent, the contract for the sale of the Lots will be between you and the highest bidder accepted by the auctioneer, known as "the Buyer". The sale will be subject to the Conditions of Sale set out at the back of our catalogue. If there is any difference between this document and the Conditions of Sale, this document will override the Conditions of Sale. The estimates and reserves that we recommend as appropriate will be discussed with you before any sale takes place.

2. **COMMISSION AND BUYER'S PREMIUM**
We shall charge you Commission at a percentage of the Hammer Price of a Lot or Lots. The percentage is fixed according to your Annual Sales (the total Hammer Price of all items sold by you in any auction saleroom of the Christie's Group in the calendar year in which a Lot is sold i.e. January to December inclusive).

If, after the sale of any Lot, your Annual Sales amount to less than £60,000 you pay Commission on the Hammer Price of that Lot at the following rates (except for wine – see below):

| | |
|---|---|
| On the first £3,000 | 15% |
| On the balance to £59,999 | 10% |

You will have to pay at least £100 for each Lot as Commission.

If, after the sale of any Lot, your Annual Sales amount to £60,000 or more you pay Commission on the Hammer Price of the Lots at the following rates (except for wine – see below):

| ANNUAL SALES | % OF THE TOTAL HAMMER PRICE |
|---|---|
| £60,000 to £149,999 | 8% |
| £150,000 to £299,999 | 7% |
| £300,000 to £599,999 | 5% |
| £600,000 to £1,499,999 | 4% |
| £1,500,000 to £2,999,999 | 2% |
| £3,000,000 or more | As agreed |

You will have to pay at least £100 for each Lot as Commission.

For wine, the commission is as follows:

| HAMMER PRICE PER CONSIGNMENT | COMMISSION RATE |
|---|---|
| Above £1,000 | 10% of the Hammer Price |
| £1,000 or less | 15% of the Hammer Price |

subject to a minimum commission of £50 per consignment.

VAT at the appropriate rate will be charged on the commission.

We shall also collect from the Buyer a premium in addition to the Hammer Price at a rate of 25 per cent of the first £25,000 of the Hammer Price plus 20 per cent of the excess of the Hammer Price above £25,000 up to and including £500,000 plus 12 per cent of any sum in excess of £500,000, or such other rates or amounts as shall be published by Christie's from time to time. For wine, the Buyer's premium is 15 per cent of the Hammer Price. We shall be entitled to retain the Buyer's premium.

3. **EXPENSES**
You agree to pay all costs relating to:
(a) packing and shipping the Lots to us for sale; (b) packing and shipping the Lots if they are returned to you; (c) any charge under clause 4(c) below; (d) any applicable customs duties; (e) marketing fee (including illustration) in the range of £150 to £500 agreed in advance with you; (f) restoration of the Lots agreed in advance with you; ~~(g) framing; (h) any examination by external experts we believe necessary for~~ catalogue description; (i) any external expert opinions we believe appropriate; (j) a contribution to our general expenses if, against our recommendation you specify an amount below which the Lots cannot be sold and they then fail to sell, although they would have sold if our recommendation had been accepted. The contribution will be 5% of the amount we recommended; (k) storage of the Lots after the sale, where applicable; (l) our administration costs if expenses are incurred under (f), (g), (h), (i) and (k) equal to 10% of those expenses; (m) any marketing costs; (n) any applicable VAT; subject to any variations stated on the Property Description.

4. **CHRISTIE'S LIABILITY**
(a) Unless we agree otherwise, Christie's will automatically accept liability for physical loss of, or damage to, the Lots, including for transportation, on and subject to conditions which are available for inspection at Christie's offices, which terms and conditions are deemed to be incorporated in full into this document. Christie's liability is also limited to the mid pre-sale estimate of the value of the Lots, or the Hammer Price plus Buyer's premium when sold. The amount referred to in the preceding sentence is solely for the purposes of our liability, and is not an undertaking by us that the Lots will be sold for this amount.
(b) Such liability as we accept in respect of the Lots shall commence from the time of handing over of the Lots to Christie's or from the time of despatch by you or your agent to Christie's, subject to packing and despatch being performed by professional fine art carriers acting under the instructions of Christie's, and shall cease on collection of the Lots by the Buyer or at the end of the seventh day after the sale, whichever is sooner. If the Lots have not been sold, they will be at your risk after that time.
(c) To justify accepting liability for property consigned to us, Christie's makes a charge calculated as a percentage of the Hammer Price or, if the Lots are unsold, the mid pre-sale estimate of their value. For all property other than fragile items such as porcelain or glass, the charge will be 1.5%; for fragile items, the charge will be 2%; if we arrange transportation, the charge will be an additional 0.5%.
(d) If you have instructed us that you do not wish us to accept liability as described in clause 4(a) above, the Lots will remain at your risk at all times until the Buyer has made payment in full and we will not debit you with the charge described in clause 4(c). You accept that, in such circumstances, we shall not be liable for any physical loss of, or damage to, the Lots. Further, you will reimburse us, our employees and agents, and (where applicable) the Buyer, for any expense incurred as a result of any claim made against us or them in respect of physical loss of, or damage to, the Lots. Your obligation to reimburse will apply even if the Buyer is found, or we are found, to be negligent, and even where repayment is required in respect of a payment made without any legal liability having first been proved. You should arrange appropriate insurance to cover these risks and notify your insurers of the terms of this clause. Even if, despite the terms of this clause, Christie's is found to be liable for any loss of, or damage to the Lots, that liability shall not exceed £50,000 or the market value of the Lots, if lower. The amount referred to in the preceding sentence is solely for the purposes of our liability, and is not an undertaking by us that the Lots will be sold for this amount.

5. **YOUR STATEMENTS REGARDING THE LOTS**
(a) You are the sole owner of the Lots with an unrestricted right to transfer ownership to the Buyer free from all third party rights or claims (including copyright claims);
(b) You have complied with all requirements, legal or otherwise, relating to any export or import of the Lots and have notified us in writing of any failure by third parties to comply with such requirements in the past of which you are aware;
(c) You have disclosed to us all information in your possession relating to the provenance of the Lots;

(d) You have notified us in writing of any material alterations to the Lots of which you are aware and of any concerns expressed by third parties of which you are aware in relation to the ownership, condition or attribution of the Lots; and

(e) Neither you, nor so far as you are aware, any third party has previously exported the Lots from the United Kingdom within the last twelve months.

If any of (a), (b), (c), (d) and (e) above are incorrect, you will reimburse us and/or the Buyer in full on demand against all claims, costs or expenses incurred by us or the Buyer as a result, whether arising in relation to the Lots or the proceeds of sale.

**6. SALE ARRANGEMENTS**

(a) We shall have complete discretion as to: the way the Lots are described and illustrated in the catalogue and any condition report, saleroom notice or other literature; the date, place and manner of sale; whether to exhibit the Lots abroad for the purposes of marketing; the decision as to which persons should be admitted to the auction, and as to which bids should be accepted; whether expert advice should be sought or any third party consulted regarding the provenance of the Lots; and the combination or division of goods for sale.

(b) Any estimate given, whether orally or in writing, is a matter of opinion only and is not an undertaking as to the price the Lots will eventually fetch.

(c) You may not withdraw the Lots from sale without our consent, unless we are in serious breach of our obligations to you under this agreement.

(d) We may withdraw the Lots from sale (or in our discretion postpone the sale for a reasonable period) at any time if (i) we have reasonable doubts as to their attribution, authenticity or provenance or (ii) we have reasonable doubts as to the accuracy of the statements made in clause 5(a), (b), (c), (d) or (e) above or (iii) you commit any serious breach of this agreement or (iv) we reasonably believe that inclusion of the Lots in the sale would potentially expose Christie's to legal claims or damage to its commercial reputation.

(e) If we consent to your withdrawing a Lot, or we withdraw under clause 6(d)(iii) above, you will become liable to pay us a fixed sum by way of compensation. The amount payable will be a sum equal to 75% of the aggregate of our commission and the Buyer's premium that would be payable if the Lots had been sold at the low estimate, together with any applicable VAT.

(f) In all cases of withdrawal, except where we have been in serious breach of this agreement, you will be liable to pay us the expenses we have incurred as described in clause 3 above.

(g) Until all amounts due from you under this clause have been received, we shall be entitled to retain possession of the Lots. We shall also be entitled to retain possession of them, for such period as is reasonable in all the circumstances, if we are notified or become aware of a claim by a third party to ownership of or possession or control of them.

**7. CONDUCT OF SALE**

(a) The Lots will be sold subject to the Reserve (being the amount below which the Lots cannot be sold). If the Reserve is not mutually agreed between us and confirmed by you in writing before the sale, the Reserve will be fixed by us in our sole discretion on the basis of our reasonable opinion as to the probable level of bids for the Lots. The Reserve cannot be above the low estimate unless the Reserve is agreed to in a currency other than sterling, and the exchange rates fluctuate between the time the Reserve is agreed and the day of the sale. In this case, unless agreed otherwise, the Reserve shall be an amount equal to the pound sterling-equivalent based on the closing exchange rate on the business day immediately preceding the sale. We shall in no circumstances be liable if bids are not received at the level of the Reserve. We shall however be entitled to sell the Lots below the Reserve. If we do so, we shall be obliged to account to you as if the Hammer Price was equal to the Reserve. If we recommend a Reserve that you consider to be too low, you will be entitled to withdraw the Lots from sale without charge at any time prior to 8 weeks before the sale.

(b) You may not bid for the Lots or employ any person to do so on your behalf, although we shall have the right to bid on your behalf up to the amount of the Reserve.

**8. AFTER THE SALE**

(a) Accounting. After the sale, we shall require payment in full from the Buyer, including payment of the Buyer's premium. Provided that we have received payment in full in cleared funds, we shall remit to you an amount equal to the Hammer Price less all charges due from you, 35 days after the date of the sale, unless we have received notice that the Lots are not authentic or are a forgery under the terms of the Limited Warranty set out in the Conditions of Sale. In the event of late payment by the Buyer we shall make such remittance to you within seven days of receipt by us of payment in cleared funds from the Buyer. If for any reason we make payment to you of the amount due before payment by the Buyer, we shall acquire ownership of the Lots and all your rights to recover payment from the Buyer. Payment will be made in sterling unless you instruct us otherwise in writing. If you require payment other than in sterling, we shall charge you for any currency costs incurred. You must send us a payment instruction form (which we can give you, or you can find on our website at http://www.christies.com). We will buy the currency of payment within 2 business working days of the date we make payment to you. Our certificate confirming the rate of exchange for such currency will be final.

(b) Artist's Resale Right (Droit de Suite). If the Lots include a work or works of art to which The Artist's Resale Right Regulations 2006 apply, we will on your behalf collect from the Buyer an amount equal to the resale royalty provided for in those Regulations and remit such amount on your behalf to the artist's collecting agent.

(c) Non-Payment by the Buyer. If the Buyer fails to pay the full amount due within 35 days after the date of sale, we shall be entitled to agree special terms on your behalf for payment and storage, and to take any steps we consider necessary to collect the amount due from the Buyer. However, we shall not be obliged either to remit the price due to you ourselves, nor to take any legal proceedings on your behalf. We shall discuss with you the appropriate course of action to be taken to recover the purchase price from the Buyer.

(d) Limited Warranty. If within 5 years of the date of the auction the Buyer satisfies us that the Buyer is entitled to exercise the remedy available under the Limited Warranty provided in the Conditions of Sale, then we shall have the right to cancel the sale. You must refund to us, on demand, the whole or part of any amount we may have paid to you representing the proceeds of sale of the Lots. Ownership of the Lots will then revert to you. We shall be entitled to retain any property of yours under our control as security for the amount due from you. Nothing in this clause affects any rights you may have against us if we have been negligent or in breach of this agreement.

(e) Post-auction sales. If any Lots are bought in or otherwise unsold by auction, unless and until we receive instructions from you to the contrary, we shall be authorised as the exclusive agent for you for a period of 2 months following the auction to sell such Lots privately for a price that will result in a payment to you of not less than the net amount – i.e. after deduction of all charges due from you – to which you would have been entitled had the Lots been sold at a price equal to the Reserve, or for such lesser amount as we and you shall agree. In such event your obligations to us and the Buyer with respect to such Lots are the same as if they had been sold at auction.

(f) Negotiated sale. This term shall mean (i) a disposal by sale by private treaty to a body mentioned in Schedule 3 of the Inheritance Tax Act 1984 or (ii) a disposal in pursuance of section 230 of the Inheritance Tax Act 1984 (acceptance of property in satisfaction of tax) or (iii) any combination of (i) and (ii). Notwithstanding the terms of any other agreement made between us relating to commission due to us in respect of a negotiated sale, if, following the striking of the auctioneer's hammer in a sale at public auction, you shall participate in a negotiated sale of any Lots then you shall account to us not only for commission but also for the Buyer's premium. Both these shall be calculated by reference to the Hammer Price and shall be payable to us by you in full on or before the conclusion of the negotiated sale.

(g) Post-sale capital gains tax valuations. If following the sale you ask us to provide valuations of the Lots for capital gains tax purposes, then in the event that you appeal against an assessment raised by HM Revenue & Customs in relation to any such valuation, we shall make a charge at our standard rates for valuation work together with any applicable VAT for work undertaken after the appeal has been lodged. Particulars of the standard rates are available on request.

(h) Unsold Lots. If any or all of the Lots are unsold and are not re-consigned to us for sale, or are not included in a sale, or are withdrawn from sale for any reason, they must be collected from us within 7 days after the date of the sale or within 35 days after we send you a notice requiring you to collect them (whichever occurs first). If any such Lots remain uncollected at the end of such period we shall arrange storage at your expense, which may involve their removal to a third party warehouse, and only release the Lots after payment has been made in full of storage, removal and any other costs incurred together with payment of all other amounts due to us. If such Lots are not collected within 90 days after the date of the sale or the date of the notice referred to above (whichever occurs first), they may be disposed of as we see fit, which may involve their sale by public auction on such terms as we consider appropriate, including those relating to estimates and reserves. We shall then account to you for the proceeds of sale, having deducted all amounts due.

(i) Outstanding charges. In the event that the amount due to you under clause 8(a) above is insufficient to enable us to deduct all charges due from you, you agree to pay any outstanding charges within 7 days from the date of invoice. If you fail to make payment within such period, we reserve the right to charge interest at such rate as we shall reasonably decide.

**9. PHOTOGRAPHS AND ILLUSTRATIONS**

We shall have the right (on a non-exclusive basis) to photograph, video or otherwise reproduce an image of the Lots. All rights in the image will belong to us, and we shall have the right to use it in whatever way we see fit.

**10. OTHER MATTERS**

(a) VAT. You will give us all relevant information about your VAT status and that of the Lots to ensure that the correct information is printed in the catalogue. Once printed, the information cannot be changed. We will apply the Auctioneer's margin scheme to the sale of the Lots unless you request us to do otherwise. If we incur any unforeseen cost or expense as a result of the information being incorrect, you will reimburse to us on demand the full amount incurred.

(b) Electrical and mechanical parts. If the Lots contain any electrical or mechanical parts, you are responsible for ensuring that these are in a safe operating condition. You will compensate us for any costs or expenses reasonably incurred by us if this does not prove to be the case.

(c) Coins, wines and guns. Special additional conditions apply to these items, as set out on the attached Property Description where appropriate.

(d) Severability. If any part of this agreement is found by any court to be invalid, illegal or unenforceable, that part may be discounted and the rest of the agreement shall continue to be valid and enforceable to the fullest extent permitted by law.

(e) Personal data. We will hold your personal data and may pass it to Christie's affiliated companies worldwide for the purposes of enabling you to consign or purchase property or services and, unless you object, advising you of forthcoming sales, events and services.

(f) Law and jurisdiction. This agreement is subject to English law, which shall apply to its construction as well as to its effect. For our benefit, you submit to the exclusive jurisdiction of the courts of the United Kingdom.

(g) No assignment. You may not assign your rights and/or obligations under this agreement unless we have given our prior written consent which will not be withheld unreasonably.

(h) Translations. Where a translation of this agreement has been provided, it is agreed between us that the English language version shall be the governing one.

I AGREE TO THE TERMS AND CONDITIONS AS DETAILED IN THIS AGREEMENT.

Consignor: Lisa Pasch (signature) Christie's: ______

Print name: Lisa Pasch Date signed: ______

Status: OWNER duly authorised. Date signed: 12/10/09 Agreement completed by: ______

Client Number: 1815440 Printed From SN: XS746

# EXHIBIT E

RUSSECK GALLERY
203 WORTH AVENUE
PALM BEACH, FL 33480

January 30, 2010

Lisa Pasch
7 Kensington Court
Warren, New Jersey 07059
908 227 4441 ph
908 604 2677 fax

Dear Lisa and Scott,
Sadly I am unable to get any real offers on your pieces .The only offers have been in the $300,000 to $400,000 range, however rest assured that I will continue to hold these works and notify you of any following offers. Best Regards, Sloane Russeck.

## Consignment Agreement

**Pablo Picasso**

*Minotaur*
1937
Gouache and ink on paper
10 ½ x 8 ½ inches (26.7 x 21.6 cm)
Dated upper left

**Provenance:**
Bernard Picasso, Paris
Jeffery Loria, New York
Russeck Gallery, Palm Beach
Private Collection, New Jersey

*A certificate from Maya Picasso accompanies this work

TELEPHONE (561) 832 4811
FACSIMILE (561) 832-4813

RUSSECK GALLERY
203 WORTH AVENUE
PALM BEACH, FL 33480

**Pablo Picasso (1881-1973)**

*Baigneuse et Cabine de Bains*

Executed September 8, 1938
Brush, ink, and wash on paper
26 ½ X 17 ½ inches (67.31 X 44.45 cm.)
Signed and dated lower center: "Picasso 8.9.38"

**Provenance:**

Private Collection, Spain (acquired from artist)
Ronald Emmanuel, London
B.T.Batsford, London
Harry Winston, Detroit
Russeck Gallery, Palm Beach
Private Collection, New York (acquired from the above in November 2006)

**Exhibited:**

Detroit, Cranbrook Art Academy, *Winston Collection*, 1951 no. 73
Michigan, University of Michigan, *Twentieth Century Painting and Sculpture from* the *Winston Collection*, 1955, no.55
Detroit, Detroit Institute of Art, *Collecting Modern Art*, 1957, no. 85
Detroit, Detroit Institute of Art, *The Varied Works of Picasso*, 1962
Indiana, The University of Indiana and Wisconsin, University of Wisconsin, *Reflections*, 1971, no. 112., illustrated in catalogue
Detroit, Detroit Institute of Art, *Selections from the Lydia and Harry L. Winston Collection*, 1972 – 73 (on extended loan)
New York, The Solomon R. Guggenheim Museum, 1973 – 1974, no.83 illustrated in catalogue

**Literature:**

Christian Zervos, *Pablo Picasso, Oeuvres de* 1937 a 1939, Paris, 1959, vol. 9, p.107, no.222, illustrated
Douglas Cooper, *Great Private Collections*, 1963, p.303, illustrated

TELEPHONE (561) 832 4811
FACSIMILE (561) 832-4813

FROM : RUSSECK GALLERY FAX NO. : 5618324813 Feb. 03 2010 12:48PM P2

RUSSECK GALLERY
203 WORTH AVENUE
PALM BEACH, FL 33480

Gene Baro, Collector: *Lydia Winston, In Art in America*, September – October 1967, p. 72 illustrated in color

The Picasso Project, *Picasso's Paintings, Watercolors, Drawings and Sculpture, Spanish Civil War* 1937 – 39, San Francisco, 1997, p. 189, no. 38 – 165, illustrated

Lisa Pasch (Consignor) Sloane Russeck (Consignee)

TELEPHONE (561) 832-4011
FACSIMILE (561) 832 4813

## SCHEDULE C (Financial Accounts - Corporations)

| | | Balance as of 2/22/10 |
|---|---|---|
| 1. | Wachovia Account Number [redacted]2463 | $0 |
| 2. | Ocean First Account Number [redacted]9836 | $0 |
| 3. | Ocean First Account Number [redacted]9828 | $0 |
| 4. | Ocean First Account Number [redacted]9810 | $50,000 |
| 5. | Ocean First Account Number [redacted]9810 | $565,679 |
| 6. | Ocean First Account Number [redacted]183 | $294,376 |